**In re Marc and Kathleen HINMAN, Debtors.**

**CITICORP CREDIT SERVICES, INC., Plaintiff,**

**v.**

**Marc and Kathleen HINMAN, Defendants.**

**Bankruptcy No. 90–05229.
Adv. No. 90–7038.**

United States Bankruptcy Court, D. North Dakota.

Oct. 25, 1990.

Richard P. Olson, Todd Cresap, Minot, N.D., for plaintiff.

James Nostdahl, Minot, N.D., for debtors.

## MEMORANDUM OPINION

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding arose by Complaint filed June 22, 1990, by which the plaintiff, Citicorp Credit Services, Inc., seeks a determination that the Debtors' outstanding indebtedness to it arising by reason of credit card charges is nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code. The allegations are generally denied.

The case came on for trial on October 17, 1990. From the evidence produced at trial and the schedules filed in connection with the case, the facts deemed material are as follows:

### Findings of Fact

The Debtors filed their joint Chapter 7 petition on March 26, 1990, listing total unsecured debt of $11,070.00 including unpaid bank charges owing to Citibank in consequence of two Visa cards and one Master card. A discharge was granted them by order entered August 9, 1990 (the bar date for section 523(c) complaints was July 3, 1990).

Debtor, Marc Hinman, was separated from the United States Air Force in May 1975 and since that time has held a variety of low income jobs—his most stable employment being as a drummer with several local bands. From February to December, 1989, he was earning $300.00 per month as a drummer. The band broke up and for the next several months (January through February, 1990) he worked in an air base pizza shop earning $206.00 per month. From February through April, 1990, he was unemployed because he could not find a job which paid enough to offset the cost of babysitting.

Co-debtor, Kathleen Hinman, has been a member of the United States Air Force since May of 1987 with separation not scheduled until May 1991. Her current gross monthly income is $1,200.00. In the fall of 1989 the Debtors' combined net monthly income was approximately $1,000.00 per month. At the filing of their

bankruptcy petition in March 1990 their joint net monthly income was listed at $950.00 according to the schedules. According to the schedules, family living expenses total $885.00 per month.

In October 1989 Kathleen applied for and received a Master card credit card (account no. 5424 1802 5563 1282) from Citibank. The card had a credit limit of $1,200.00. By February 16, 1990, charges against this card had exceeded the credit limit with total unpaid purchases totalling $1,375.20 at the time of petition filing.

In January 1990, Marc applied for and was issued an NFL Visa credit card (account no. 4128 770 763 808) from Citibank. This card had a credit limit of $700.00. Charges made against this card total $759.81 at the time of filing and exceeded the card's credit limit.

Kathleen also applied for a Visa card in January 1990 and received one from Citibank with a $2,200.00 credit limit (account no. 4128 293 283 763). Charges made against this card also exceeded the credit limit at the time of filing and totaled $2,288.12.

Charges were made on the Master card in November and December 1989, totalling $1,295.68. By November of 1989 the Debtors already were obligated to other retail creditors in the sum of $4,120.00 [1] and in December incurred an additional debt of $500.00 to Amoco Oil Company. By November 1989 they also had secured debts outstanding of at least $2,475.00.

In February 1990 charges made against the two Visa cards totaled $3,032.00. This was at a time when the Debtors' combined joint income was less than $1,000.00 per month and living expenses were $885.00 per month; at a time when they already owed over $1,000.00 on their Master card in addition to the earlier incurred unsecured consumer debt of $4,120.00 and $2,475.00 of secured debt outstanding.

From the monthly statements it appears that the Debtors were using the three cards for everything from auto repairs to evenings out. The cards were used to purchase restaurant meals totalling $138.00, collectible stamps and coins totalling $211.00, cash advances of $355.00, fishing gear totalling $33.80 and $778.00 for outdoor wear purchased at an up-scale sporting goods store. The Debtors' 1984 Jeep Cherokee was stolen in November 1989 and, unable to afford a reliable replacement vehicle, they bought two old cars which were both in need of frequent repairs. At trial Debtor, Marc Hinman, acknowledged that they could not afford to buy a good used car so bought the old cars upon which they charged repair expenses of over $1,700.00 in February 1990. He also testified that when they could not afford to buy something and needed clothes or a nicer than normal present they would simply make use of their charge cards at better stores. At one point he said they "got tired of buying at K–Mart all the time". Explaining how he and his wife came to purchase expensive ski jackets and $138.00 shoes at a time when they could not even afford a serviceable used car, Marc stated he felt they deserved these items—"my feet deserve it" was the exact statement made. The parties understood that they had exceeded the credit limits on all cards but stated at trial they had no intention of not paying their bills. The Debtors were, however, unable to explain exactly how they intended to accomplish payment.

### Conclusions of Law

The bank's complaint arises from section 523(a)(2)(A) of the Bankruptcy Code which provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

---

**1.** Dayton's $500.00; Firestone $800.00; J.C. Penney $1,600.00; Sears $720.00; Northern Tier Credit Union $500.00.

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

To establish a case under the foregoing section in typical fraud situations requires proof by clear and convincing evidence of the following five elements:

(1) that the debtor made representations;

(2) that at the time the representations were made he knew them to be false;

(3) that the representations were made with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on the misrepresentations;

(5) that the creditor sustained the alleged injury as a proximate result of the representations having been made.

*In re Ophaug,* 827 F.2d 340, 342 n. 1 (8th Cir.1987); *In re Mutschler,* 45 B.R. 482, 490 (Bankr.D.N.D.1984). Third party credit card transactions, however, are not typical fraud cases due to the difficulty, if not impossibility, of applying the concepts of representation and reliance to situations where the card holder, in making use of the card presents it not to the bank issuer seeking section 523 relief but to a retail merchant who accepts it in faith that the issuing bank will pay him. Credit card cases involve an ongoing relationship between the holder and issuer with only infrequent inquiry being made concerning the status of the holder's financial affairs. Recognizing this relationship, courts have come to modify the way in which the elements of section 523(a)(2)(A) proof are met in credit card situations.

■ The element of representation is implied from the mere use of a bank card. The use of a bank or credit card is an implied representation to the issuer that the holder has both the intent and ability to pay the issuer for the charged purchases and advances. *In re Cirineo,* 110 B.R. 754, 758 (Bankr.E.D.Pa.1990); *Matter of Stewart,* 91 B.R. 489, 494 (Bankr.S.D. Iowa 1988); *Comerica Bank–Midwest v. Kouloumbris,* 69 B.R. 229, 230 (Bankr.N.D.Ill. 1986); *In re Barnacle,* 44 B.R. 50, 53 (Bankr.D.Minn.1984). In the instant case this element is easily established by the mere fact that the Debtors used the three cards to make purchases.

■ Proof that a credit card debtor knew the representations were false and that they were made with the intent and purpose of deceiving the issuer are more difficult to prove because, as with all fraud cases, there is an element of subjective intent to deceive. Rarely, if ever, will a debtor admit such was his intent. Such is the situation in the instant case. Courts are in agreement, however, that actual fraud *i.e.,* an intent to deceive, may be inferred from objective factors suggesting that the debtor knew or should have known at the time of card use that he/she was insolvent and lacked the ability to repay. *In re Pedrazzini,* 644 F.2d 756 (9th Cir. 1981); *In re Dougherty,* 84 B.R. 653 (9th Cir. B.A.P.1988); *In re Faulk,* 69 B.R. 743 (Bankr.N.D.Ind.1986). These courts and others have come to adopt the following nonexclusive list as those factors from which a court may infer the requisite intent in cases of credit card fraud:

1. the length of time between the charges made and the filing of bankruptcy;

2. whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. number of charges made;

4. the amount of charges;

5. the financial condition of the debtor at the time the charges were made;

6. whether the charges were above the credit limit of the account;

7. whether the debtor made multiple charges on the same day;

8. whether or not the debtor was employed;

9. the debtor's prospects for employment;

10. financial sophistication of the debtor;

11. whether there was a sudden change in the debtor's buying habits;

12. whether the purchases were made for luxuries or necessities.

See In re Borste, 117 B.R. 995, 997 (Bankr. W.D.Wash.1990). Although the presence of one factor alone may not be conclusive of an intent to deceive, the presence of many or most of them does permit a court to infer thereby that debtors knew at the time that repayment would be impossible.

All of the charges upon which Citicorp is seeking nondischargeability were incurred within four months of bankruptcy filing with the bulk of them occurring in the month immediately preceding filing.

Charges made in the months of November and December were 64.75% of the Debtors' combined gross income for those two months and were incurred despite previously outstanding unsecured debts of over $4,000.00. By January 1990, they had outstanding unpaid obligations in consequence of the November and December Master card purchases on top of the earlier debt; yet, both of them went ahead and applied for two more credit cards. By January Marc had left the band and was working in a pizza shop for $260.00 per month—not enough, he said, to even cover babysitting expenses. How, given this level of income, the Debtors could ever hope to repay the debts already incurred, let alone new charge obligations is impossible to reckon. Between them they had a net monthly income of $1,000.00 and living expenses of $885.00 which left, at best, discretionary income of $115.00 per month. In February 1990, already faced with outstanding unpaid debts of $8,390.00, they decided they needed collectible coins, fishing gear and luxury clothing goods. To this end they charged another $3,032.00 on the two Visa cards—charges which exceeded their February gross income by over 200% and which charges were twenty-six times their disposable income for that month. The Debtors knew their financial condition during these months was poor, even acknowledging at trial that they couldn't afford a decent used car. Marc's employment history was a series of low end jobs. In December he quit as a band member only to take up another menial job which he left in February and thereafter became unemployed. Kathleen was the only stable wage earner during this period

and given Marc's job experience and her 1991 separation date, they had no reason to believe that Marc would secure lucrative employment in the near future.

Most of the purchases were for unnecessary luxury items including restaurants, coin and stamp collections, sporting gear and luxury clothing items. These purchases were made, as Marc acknowledged, not because they were necessities but because, "they deserved them". All three of the cards were used beyond their credit limits and the Debtors knew these limits had been exceeded.

The foregoing facts meet many of the enumerated factors and the court concludes, therefrom, that the Debtors used the three cards in question knowing they had no ability to repay the charges incurred. Thus, the second and third elements of proof necessary to a section 523(a)(2)(A) action have been met.

As before noted, direct proof of reliance is difficult in credit card situations. The credit card industry functions upon the issuer's guarantee of payment to the merchant. Reliance on the part of the issuer is inherent in the system because a card holder in using the credit card forces the issuer to honor its guarantee to the merchant. As discussed in In re Senty, 42 B.R. 456, 460 (Bankr.S.D.N.Y.1984):

"Since the misrepresentation here concerns the debtors tender of the card as payment, the issue of reliance by the issuers of the card who have direct knowledge of the misrepresentation, would seem to present a conceptual difficulty. But the issuer, having paid the charges incurred by the card holder has become subrogated to the debt and is entitled to claim the reliance of the provider of goods and services. Furthermore, the credit system functions upon the user's guarantee of payment for charges on its cards. The debtor, in presenting the card and thereby forcing the issuer to honor its guarantee to merchants necessarily compelled reliance by the issuer." See also In re Cullen, 63 B.R. 33, 36 (Bankr.E.D.Mo.1986).

The representations were the proximate cause of Citicorp sustaining a loss of $4,423.13 in unpaid Master card and Visa charges.

There are some who place blame for credit card defaults upon the industry and the seeming cavalier manner in which cards are issued to nearly anyone. While the industry may well be far too lax in its card issuance policies, this court does not believe that policy should in any respect lessen the degree of individual financial responsibility to be imposed upon credit card consumers. It is not the issuance or even possession of a card which results in the incredible number of credit card driven consumer bankruptcies. Rather, it is the unbridled and irresponsible use of credit by people who either have no cash flow consciousness in the first place, or who conveniently leave it at the curb side when entering a retail establishment that is at the root of the problem. To place blame on the card issuer is akin to moralizing over the crime of shoplifting by putting the retailer at fault for attractive merchandising efforts and for not stationing armed guards in every isle. Each person must accept responsibility for his or her own actions and be responsible for his or her own pocketbook. It is an unfortunate observation of modern society that the phrase, "I can't afford it" has become relegated to the unconscious mind of the American consumer. It is no dishonor to shop at K–Mart nor is it dishonorable to look at up-scale merchandise and conclude, "I can't afford it".

All elements of Citicorp's complaint for nondischargeability under section 523(a)(2)(A) have been met. Accordingly, IT IS ORDERED that judgment be entered in favor of Citicorp Credit Services, Inc., and against the Debtors, Marc and Kathleen Hinman, in the sum of $4,423.13, said sum being nondischargeable in bankruptcy.

LET JUDGMENT BE ENTERED ACCORDINGLY.