In re Janet Marie STEARNS, Debtor.

Star Bank, N.A., Plaintiff,

v.

Janet Marie Stearns, Defendant.

**Bankruptcy No. 97–38186.
Adversary No. 98–3067.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Nov. 26, 1999.

Philip R. Schenkenberg, St. Paul, MN, for defendant.

John F. Wagner, Apple Valley, MN, for plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding for determination of dischargeability of debt came on before the Court for trial. The Plaintiff appeared by its attorney, Philip R. Schenkenberg. The Defendant appeared personally and by her attorney, John F. Wagner. Upon the evidence adduced at the trial and the memoranda and arguments of counsel, the Court makes the following:

### FINDINGS OF FACT

*The Parties.*

The Plaintiff is a banking institution, headquartered in Cincinnati, Ohio. It provides consumer credit through revolving charge accounts under the "VISA" system.

The Defendant is a resident of Apple Valley, Minnesota. She obtained a VISA account from the Plaintiff in February, 1996. When the Defendant filed for bankruptcy relief under Chapter 7 on December 7, 1997, the outstanding balance owing to the Plaintiff on the account was $7,854.08. The Defendant duly scheduled the Plaintiff as a creditor on the papers for her bankruptcy case.

*The Events.*

The parties' relationship as creditor and debtor had its origins in a mass solicitation by the Plaintiff. The Plaintiff first obtained the Defendant's name, among those of other potential VISA card customers,

from the TRW credit reporting system. The Plaintiff ordered a first list from TRW as part of an effort to cultivate its charge card lending portfolio; it specified its qualifications for creditworthiness among the sorts of data that TRW collects from numerous sources, with particular reference to past usage of consumer credit and current indebtedness. After obtaining this larger list from TRW, the Plaintiff used a different vendor of credit analysis services to select the best payment risks from the TRW list, in a number equal to the size of the solicitational mailing that it planned to make.[1]

After obtaining the Defendant's name through this process, the Plaintiff mailed a solicitation for a "Pre–Approved Star Bank VISA Gold card" to her in early January, 1996. The mailing included a form "acceptance certificate" under which the recipient could signal a willingness to open a VISA account. The "certificate" included a space with blanks for completion by the recipient, $3 \times 3.5$ inches in size. The blanks were to be completed with the prospective customer's social security number; date of birth; length of time at current residence; monthly housing payment; home and business telephone numbers; current employer, duration of employment, and title or position; and gross annual household income. The form requested no other financial information from the recipient, and only a modicum of such information for any person who was to be a co-debtor on the account.

The Defendant completed the form. She stated her length of time at her current address as one year; her monthly housing payment as $400.00; her position as "Dispatcher," the duration of that employment as one and one-half years, and her employer as "City of Northfield," and her gross annual household income as $33,000.00. These were accurate reflections of her main employment and gross income at the time; she was earning a gross annual

salary of $30,000.00 to $34,000.00 from employment as a police dispatcher with the City of Northfield, Minnesota, and was also making approximately $3,000.00 per year from a second job with A+ Driving School.

The Defendant returned the form to the Plaintiff. At that time she had "two or three" other credit card accounts open, on which she was maintaining very small monthly balances. She was generally current on her personal debt obligations at the time, and was having approximately $150.00 per month withheld from her wages for deposit into a savings account at a credit union.

After the Plaintiff received the "acceptance certificate," its employee input the data on its computer system, and obtained an updated, electronically-transmitted individual report on the Defendant's credit history from TRW. After the inputting employee checked the updated report for "drastic changes," and put them into the Plaintiff's computer system, an analyst reviewed the results and determined the Defendant's creditworthiness.

Throughout this process, the Plaintiff and its employees relied on the information provided by TRW-a summary of data compiled from reports made by the Defendant's past creditors to TRW, apparently on a periodic basis. The Plaintiff's assistant vice-president, James Deller, testified that the Plaintiff's staff believes that the Plaintiff can receive "95 to 99 percent of the information" they need for individual credit evaluation from TRW's reports.

TRW assigns an "MDS score" of creditworthiness[2] to the subjects of its reports. At the time of the Plaintiff's request in late January, 1996, TRW gave the Defendant a value of 339. Deller testified that this was "an excellent score" per the Plaintiff's criteria. The report showed that the Defendant had maintained credit card accounts

---

1. The identity of the second credit evaluator is not revealed by the record.

2. The record does not reveal the meaning of this acronym.

since 1988; that she had made payment per their terms; and that some of her card accounts were not currently active. After all this information was inputted, the programs on the Plaintiff's computer systems reformatted the collected data and displayed it to enable a final evaluation of the Defendant's application. At the time, the Plaintiff, through its analysts, relied solely on this final display in passing on initial applications for credit card accounts.

Overall, Deller opined at trial, the results of the Defendant's application process showed her to be "an excellent risk" for the issuance of a VISA card. The Plaintiff's analyst apparently had been of like opinion, because he or she elected to have the Plaintiff issue a card to the Defendant. The analyst then used the formulas set forth in a "Credit Card Matrix" to calculate the dollar-limit of charging privileges that the Defendant was to have, by factoring in the ratio of her preexisting debt to her income. Though the "matrix" contained a "New Factor" multiple to apply to gross income that would have resulted in a lower credit limit for the Defendant, the analyst used the matrix's "Old Factor" because the Plaintiff's staff had not implemented the new one throughout its system. Applying the old factor, the analyst determined that the Defendant would be offered an account limit of $5,900.00. The analyst forwent a verification of the Defendant's income and income source, in light of her "extremely strong" credit history as reported by TRW. It was, however, "normal" to do such a verification for a credit limit of the level indicated by the application of the matrix.

The Plaintiff, then, issued a VISA card with a $5,900.00 charge limit to the Defendant. It also sent her a copy of a document entitled "Star Bank Credit Card Account Agreement." In pertinent part, this standard printed form provides:

> *Purchases and Cash Advances.* You can use the Card for Purchases and Cash Advances. . . . You will owe us for these amounts plus Finance Charge and

Other Charges, if any, all payable in United States Dollars.

> *Monthly Statement.* . . . You must pay us . . . according to the Terms and Conditions of the Account.

**Terms and Conditions (Including Federal Truth In Lending Disclosures)**

. . .

(F) *The minimum periodic payment required:*

(1) *Minimum Payment.* If you elect not to pay your balance in full, a payment of 2% of the New Balance must be made by you by the Closing Date of the next Billing Cycle as shown on your statement under "Payment Due Date." If the calculated Payment is less than $10.00 then the Minimum Payment will be $10.00. If the New Balance is less than $10.00 then only the new Balance will be due. Calculated payments will be rounded to the nearest whole dollar.

In addition to the above, the Minimum Payment will also include the amount by which the New Balance exceeds the Credit Line for the Account of the calculated Minimum Payment and the amount of all past due payments. However, these additions are due immediately.

(2) *Pay Ahead Plan.* If you elect to pay more than the Minimum Payment, but less than the New Balance, then the amount in excess of the Minimum Payment will be applied to and will reduce the Minimum Payment due for the next Billing Cycle. However, payment of the New Balance in full will not reduce the Minimum Payment for the next Billing Cycle.

. . .

ADDITIONAL PROVISIONS

**You also agree to all of the following:**

. . .

*Termination.* Either you or we may terminate or suspend our credit privileges under this Agreement anytime. . . .

. . .

*Default.* You will be in default on this Agreement if you do not make at least the Minimum Payment on or before the Payment Due Date, you try to or do exceed your Credit Line without our permission, become subject to bankruptcy or insolvency proceedings, attachment or garnishment proceedings are instituted against you or your property, or we reasonably deem ourself insecure, provide us with false information or signature *[illeg.]* or fail to comply with any provision of this Agreement.

Nowhere in this document, or in any other in the record, is there any language that purports to represent or warrant that the Defendant had the ability to maintain payment on the account pursuant to the substantive terms of the agreement, or that she would have that ability when using the account at any time in the future.

The Defendant's VISA account remained open until late 1997. During that whole period, the Plaintiff did not request or require her to submit any further information, or to make any further statement or representation, in writing or orally. Nor did the Defendant ever submit any such information or make any such statement to the Plaintiff, unsolicited.

As a way of monitoring its credit card holders' financial positions, including that of the Defendant, the Plaintiff subscribed to another data reporting service.[3] In Deller's estimation, the reports from this service reflect the current outstanding indebtedness of individual consumers with some accuracy. The issuing service assigns a scoring of ongoing credit risk based on that level. However, as he noted, the service is not really an effective tool for stopping credit card abuse through rapid runup, because it only reports once per month, after the end of the month. As Deller admitted, it serves more as a report of damage already done, than as a warning signal to prompt curtailment of charging privileges.

The Defendant began using the card in March, 1996. Her very first statement showed three cash advances taken on one day from automated teller machines at the Mystic Lake Casino in Prior Lake, Minnesota, totaling $160.00 plus cash-advance charges. The second statement showed eight such advances totaling $300.00. Over the first year of the account, almost all of the Defendant's usage was for small cash withdrawals at that casino. The Defendant attended Gamblers Anonymous meetings for several months in mid–1996, "to put a curb on" her use of casinos, but began frequenting them on a weekly basis as that year wore on.

The Defendant was delinquent on payment under the first statement on the account. She then established a pattern of making payments of $30.00 to $50.00 per month—enough to meet the Plaintiff's minimum stated payment requirement, and a bit more. On March 14, 1997, she made a payment of $1,483.84 on the account, from the proceeds of a loan secured by a second mortgage against her homestead. This left a balance of approximately $414.00 on the account.[4] Immediately

---

3. Deller identified the vendor of this service "Fair Isaacs" never giving more specificity than that. Apparently, the correct appellation is "Fair, Isaac and Co.," or something close to that. The mechanics of the evaluation process developed by Fair, Isaac and Co. are summarized in *In re Ellingsworth,* 212 B.R. 326, 331 (Bankr.W.D.Mo.1997). The report run for the Defendant on this service-received into evidence as Plaintiff's Exhibit 6–contains no names or marks identifying who or what generated it.

4. The Defendant took out the mortgage-secured loan to pay down this and other credit card accounts, all of which she had incurred through cash advances for gambling. She was having increasing difficulty meeting all of the payments. Apparently, she intended to use the mortgage-secured loan as a partial consolidation, to work in conjunction with the lowered minimum-payment obligations that

after the Defendant made this payment, the Plaintiff raised her credit limit to $7,100.00.

Throughout this period, the Defendant remained employed by the City of Northfield. In June, 1997, she left that employment for a similar position with the Twin Cities suburb of Lakeville, at a higher rate of pay. Within one month, however, the City of Lakeville terminated the Defendant's employment. She applied for unemployment compensation benefits, and then received an offer of part-time employment with a business called Floyd Total Security. When the Floyd Total Security position did not pay enough for her 36–hour–per–week schedule to meet her needs, she took a second part-time position with A+ Driving School. She did not obtain another full-time job until after her bankruptcy filing. From the date she was terminated by Lakeville until then, however, she actively sought employment by sending out resumes to governments and businesses that might need someone with telecommunications, dispatching, and driving experience; she had "several interviews," and apparently came close to landing a position with the City of Eagan, Minnesota.

Shortly before the termination of her employment with the City of Lakeville, the Defendant's gambling activity "escalated." This pattern continued during the two-month period from August 25 to October 30, 1997. At the time, the Defendant held three other revolving charge accounts;

two of them accumulated balances of $4,000.00 to $5,000.00 each before her bankruptcy filing,[5] and the third had already hit its charging limit.

During the period from August 25, 1997 to October 31, 1997, the Defendant used her account with the Plaintiff to obtain $7,800.00 in cash advances through facilities at the Mystic Lake Casino and the Treasure Island Casino in Red Wing, Minnesota.[6] She obtained the cash in increments of $100.00 to $200.00, net of the fees, and used it to gamble at the casinos.

During the two months, the Defendant was succumbing to the "gambler's dream" of a big prize that would allow her to pay the credit card balances she was accumulating, in whole or in part. She had had one such in August, 1996, a $4,000.00 win at a quarter slot machine, and expected to have more. Contemporaneously, though, she recognized that when gambling "sometimes you won, sometimes you lost." Too, at the time she did not have the financial means from more prosaic sources to maintain payments on her charge card accounts at their maximum balances: her net earnings from the A+ Driving School and Floyd Total Security amounted to $1,382.00 per month, and her personal living expenses totaled $1,751.00.[7] For that matter, even had she kept her higher-wage income with the City of Lakeville, or had she been successful in her search for comparably-salaried employment, the Defendant could not have serviced the credit

smaller credit-card balances would have brought. She hoped to reduce her monthly account payments down to a level she could make from her current income.

5. It is not possible to determine whether the Defendant ran up these accounts during the several months in question. At trial, the Defendant could not remember the accounts' balances as of August, 1997. The Plaintiff offered no other evidence going to the point.

6. This figure includes the fees charged by the casinos' cash facilities, which amounted to 8 percent of the principal amount of the draws,

and the Plaintiff's 2 percent cash-advance fees. As the Defendant admitted at trial, these inflated service charges made the process "an awfully expensive way to get cash."

7. These are the figures set forth on the Debtor's Schedules I and J, which she executed in mid-December, 1997. She testified that these schedules reflected her financial position throughout the fall of 1997. The expense total includes the regular payments on her homestead mortgages and an automobile loan, but on no other debts.

card balances she was quickly accumulating.[8]

By mid-November, 1997, after resuming attendance at Gamblers Anonymous, the Defendant recognized the untenable position she had made for herself. Realizing that the "big win" could not be her financial salvation, she stopped using credit cards to fund her gambling. She saw an attorney regarding a bankruptcy filing by the end of that month. She had not even thought about bankruptcy before mid-November. Ultimately, she filed to avoid "losing everything." Though she managed to retain her homestead at the time, she has since sold it.

Throughout the summer and fall of 1997, the Defendant "never intended to not pay" the Plaintiff and the issuers of her other credit cards. She made sporadic small payments on her account with the Plaintiff, as follows:

8. The Defendant admitted this on examination as an adverse witness.

9. Apparently because of the large lump-sum payment in February, 1997, between February and August, 1997, the Plaintiff's monthly statements to the Defendant required specified "minimum payments" of only $10.00 each, and then only on statements issued in March and July. Under "minimum payment" for the other five months was the notation "pre-paid." The record does not reveal the rationale behind the erratic fixing of payment requirements.

10. This did not occur until October 27, 1999. The account balance on the statement issued in November, 1997, was $7,854.08, and the "credit line" was stated as $7,100.00. Three cash advances at the Mystic Lake Casino had pushed the account over limit; two more, plus various fees and charges, put it up to the $7,800.00—plus balance. When the Defendant did not make payment on that statement by the due date, the next statement showed a balance of $7,991.56.

11. This was not entirely accurate, as he had admitted earlier that she had defaulted on the first payment due after the opening of the account. After the "Past Due Message" on the statement for the period closing April 15, 1996, however, there were no others.

| Month in 1997 | Amount |
|---|---|
| March | $ 20.00 |
| April | $ 25.00 |
| May | $ 25.00 |
| July | $ 40.00 |
| September | $ 18.00 |
| October | $100.00 [9] |

At trial, she could not remember ever having been aware of exceeding the charging limit on the account.[10] Deller admitted at trial that through the issuance of the statement for the period closing October 15, 1997, the Defendant "was still under her credit limit, and still hadn't missed a payment." [11]

## CONCLUSIONS OF LAW

This sort of lawsuit has come to be known in bankruptcy-law circles as "credit card dischargeability litigation." The Plaintiff maintains that the Defendant's use of her VISA card account between August 25 and October 30, 1997, worked an "actual fraud." [12] It seeks a judgment that her debt to it is excepted from discharge in bankruptcy to the extent of $6713.79.[13] As authority, the Plaintiff relies on 11 U.S.C. § 523(a)(2)(A).[14]

12. The Plaintiff neither pleaded nor presented this matter as a case of fraud in the inception of the account; it does not accuse the Defendant of misstating any of the data requested on the "acceptance certificate." The gravamen, rather, is that the Defendant fraudulently *used* the account once she procured it.

13. The Plaintiff originally sought the determination as to the sum of $7,343.75. At trial, its counsel reduced the request. The reduction was made on a forthright admission that the Plaintiff could not maintain its fraud claim as to a $500.00 withdrawal made by the Defendant via a "Star check" in mid-July, 1997.

14. In pertinent part, this statute provides:

A discharge under [11 U.S.C. § ] 727 . . . does not discharge in individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent abstained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

■ In accord with the congressional intent, the judicial construction of § 523(a)(2)(A) uses the generally-recognized elements of fraud under the "dominant consensus of common-law jurisdictions." *Field v. Mans,* 516 U.S. 59, 71 at n. 9, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). *See also In re Dallam,* 850 F.2d 446, 449 (8th Cir.(Mo.)1988) (§ 523(a)(2)(A) "has been construed to incorporate the elements of common law fraud . . ."). In this Circuit, a creditor relying on § 523(a)(2)(A) must prove up the following fact elements:

1. The debtor made a false representation of fact;

2. The debtor knew the representation to be false at the time the debtor made it;

3. The debtor made the representation with the intent and purpose of deceiving the creditor;

4. The creditor justifiably relied on the debtor's representation; and

5. The creditor sustained the alleged injury as the proximate result of the making of the representation.

*In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987), and *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987), as modified by *Field v. Mans,* 516 U.S. at 74–75, 116 S.Ct. 437; *In re Moen,* 238 B.R. 785, 790 (8th Cir. BAP 1999).

### 1. Representation of Fact.

The Plaintiff's theory of suit is built on this framing of the elements. It is familiar to anyone acquainted with the burgeoning caselaw on credit card dischargeability, and it is set forth in its attorney's trial brief:

A majority of courts, including many in the Eighth Circuit, hold that by [sic] the use of a credit card constitutes a representation of both an intent and ability to pay the debt incurred.

Then, the Plaintiff urges, the circumstances surrounding the Defendant's use of the card show that she intended to "defraud" the Plaintiff by her use of the card, and that it justifiably relied on the implied representations to its detriment—that detriment having been the extension of credit to an insolvent customer who later filed for bankruptcy.

Many bankruptcy courts have bought into this theory, in proceedings involving comparable facts. *E.g., In re Kurtz,* 213 B.R. 253, 259 (Bankr.N.D.N.Y.1997); *In re Van Dyke,* 205 B.R. 587, 588 (Bankr. W.D.Mo.1997); *In re Valdes,* 188 B.R. 533, 537 (Bankr.D.Md.1995); *In re Hoyle,* 183 B.R. 635, 638 (Bankr.D.Kan.1995); *In re Nahas,* 181 B.R. 930, 933 (Bankr.S.D.Ind. 1994); *In re Pursley,* 158 B.R. 664, 668 (Bankr.N.D.Ohio 1993); *In re Branch,* 158 B.R. 475, 477 (Bankr.W.D.Mo.1993); *In re Vermillion,* 136 B.R. 225, 227 (Bankr. W.D.Mo.1992); *In re Larson,* 136 B.R. 540, 544 (Bankr.D.N.D.1992); *In re Bartlett,* 128 B.R. 775, 779–780 (Bankr.W.D.Mo. 1991); *In re Preece,* 125 B.R. 474, 477 (Bankr.W.D.Tex.1991); *In re Hinman,* 120 B.R. 1018, 1021 (Bankr.D.N.D.1990); *In re Barnacle,* 44 B.R. 50, 53 (Bankr.D.Minn. 1984); *In re Johnson,* 40 B.R. 756, 758 (Bankr.D.Minn.1984); *In re Lay,* 29 B.R. 258, 260 (Bankr.M.D.Fla.1983). Their decisions are usually framed in prosaic language, but occasionally they resound in a moral high dudgeon. *In re Hinman,* 120 B.R. at 1023.

■ Seldom, however, do the decisions in this school take meaningful account of the bedrock precepts of dischargeability jurisprudence. The appellate courts framed these principles to guide the trial courts in their conclusions of law as well as their fact-finding:

1. Because "statutory exceptions to discharge are to be narrowly construed," *In re Long,* 774 F.2d 875, 879 (8th Cir.1985), creditors seeking such relief bear the burden to affirmatively prove *facts* to satisfy all of the recognized elements of their exceptions. *In re Scarborough,* 171 F.3d 638, 641 (8th Cir.1999); *First*

*Nat'l Bank v. Pontow,* 111 F.3d 604, 608 (8th Cir.1997); *In re Werner,* 5 F.3d 1170, 1171 (8th Cir.1993); *In re Belfry,* 862 F.2d 661, 662 (8th Cir. 1988).

2. Congress enacted the law of nondischargeability for fraud to prevent the abuse of bankruptcy remedies by those who had knowingly and deliberately harmed their creditors. *Cohen v. De La Cruz,* 523 U.S. 213, 221–23, 118 S.Ct. 1212, 1218, 140 L.Ed.2d 341 (1998); *Grogan v. Garner,* 498 U.S. 279, 290, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Brown v. Felsen,* 442 U.S. 127, 138, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *In re Hunter,* 771 F.2d 1126, 1129 (8th Cir.1985).

3. For debtors who have not knowingly and deliberately gulled their creditors, however, the presumptive entitlement to discharge and the "fresh start" of bankruptcy apply. *In re Hunter,* 771 F.2d at 1129.

4. Thus, a judgment of nondischargeability may not be made on a holding of constructive fraud or fraud implied in law—that is, fraud judicially deemed after the fact, and only to reach an "equitable" result in the context of later court proceedings, but which does not require an affirmative finding of fraudulent intent contemporaneous with the alleged injury. *In re Ophaug,* 827 F.2d at 342 n. 1. Rather, the creditor must make an affirmative showing, by direct or strong circumstantial evidence, that the defendant intended to induce reliance on the part of the plaintiff, knowing of the falsity of the representation or pretense. *In re Moen,* 238 B.R. at 791.

Building on these precepts, several courts have rejected the notion that the mere use of a credit card entails *any* representation, actual or "implied," of any fact, state of affairs, or intent. They have incorporated this point into several variant rationales. *First Nat'l Bank of Mobile v. Roddenberry,* 701 F.2d 927, 932 (11th Cir. 1983); *In re Etto,* 210 B.R. 734, 739 (Bankr.N.D.Ohio 1997); *In re McDaniel,* 202 B.R. 74, 78 (Bankr.N.D.Tex.1996); *In re Samani,* 192 B.R. 877, 879 (Bankr. S.D.Tex.1996); *In re Alvi,* 191 B.R. 724, 731 (Bankr.N.D.Ill.1996); *In re Cox,* 182 B.R. 626, 634–635 (Bankr.D.Mass.1995);[15] *In re Landen,* 95 B.R. 826, 827–828 (Bankr.M.D.Fla.1989).

■ There is much to be said for this latter position. First, to the extent that the "implied representation" propounded by issuers of credit cards goes to the account holder's contemporaneous ability to pay, its use to satisfy this element is barred by the very language of the statute. Section 523(a)(2)(A) does not apply to "a statement representing the debtor's ... financial condition."[16] *In re Long,* 774 F.2d 875, 877 n. 1 (8th Cir.1985); *In re Wyant,* 236 B.R. 684, 698–699 (Bankr. D.Minn.1999); *In re Gibson,* 149 B.R. 562, 569 (Bankr.D.Minn.1993). *See also In re Hernandez,* 208 B.R. 872, 879 and n. 15 (Bankr.W.D.Tex.1997). Second, the *Roddenberry/Alvi* school has logical integrity, at least as to two of the prongs of the statute. By their very nature, a "fraudulent representation" and an "actual fraud" should have some overt manifestation in the words of a human language. No court adopting the "implied representation" theory has gleaned and quoted such words from the record before it. The phrase "implied representation" itself seems almost a contradiction in terms: if a repre-

---

**15.** Two judges of the United States District Court for the District of Massachusetts later rejected Cox's rationale. *In re Nguyen,* 208 B.R. 258 (D.Mass.1997); *AT & T Univ. Card Serv. Corp. v. Pakdaman,* 210 B.R. 886 (D.Mass.1997).

**16.** The framers of the Code clearly intended that statements regarding the debtor's financial condition be actionable only if written, and thence only under 11 U.S.C. § 523(a)(2)(B).

sentation is dictionary-defined as "a designation *by some term, symbol, or the like,* as of things true or alleged," [17] how is it to be gleaned from the nebulosity of an event, transaction, or series of them, if the words simply were not there in the first place? *In re Alvi,* 191 B.R. at 731–732. Finally, the general dictate of judicial restraint militates against a theory that relies on an "implication." Where the source of legal governance is a statute that incorporates hard-and-fast, long-recognized legal principles, and that contains no reference to any process of "implication" on the part of the subject debtor, a court should be very wary of engrafting such an indistinct concept.[18] *In re Cox,* 182 B.R. at 634. *See, in general, discussion in In re Ford,* 186 B.R. 312, 317–318 (Bankr.N.D.Ga.1995).

█ If the purpose of nondischargeability is to deny the benefit of bankruptcy to an active and knowing wrongdoer, however, *Roddenberry's* strict assumption-of-the-risk rule does not function well in at least one scenario involving the use of credit cards. That, of course, is one in which the debtor did not commit fraud in the procurement of an account, but in which he did "run up" the account with a *concurrent* intent to evade his contractual duty of payment, by subterfuge or by bankruptcy. Recognizing that, the Ninth Circuit has enunciated a third formulation of the "representation" element. *In re Eashai,* 87 F.3d 1082 (9th Cir.1996); *In re Anastas,* 94 F.3d 1280 (9th Cir.1996). In *Anastas,* the Ninth Circuit

emphasize[d] that the representation made by the card holder in a credit card transaction is not that he has an ability to repay the debt; *it is that he has an intention to repay.*

. . .

[C]ourts faced with the issue of dischargeability of credit card debt must take care to avoid forming the inquiry under section 523(a)(2)(A) as whether the debtor recklessly represented his financial condition. The correct inquiry is whether the debtor either intentionally or with recklessness as to its truth or falsity, made the representation that he intended to repay the debt.

94 F.3d at 1285–1286.

This formulation on the representation element falls between that of the "implied representation" theory, and that of *Roddenberry.* It recognizes that resort is often made to credit cards by debtors who are in financial straits due to loss of employment, family breakdown, or personal emergency—as a flexible and readily-accessed means of credit, just as they are aggressively promoted by their issuers. *In re Eashai,* 87 F.3d at 1090. Credit card holders who use them in this way may not do so wisely, for any of many reasons, but that is a far cry from saying that they are doing so fraudulently. *Id.* Holders of credit cards have the proffered incentives of ready availability of cash or credit, high account limits, and low minimum payments, the latter recalculated on a monthly basis after the accrual of addi-

---

17. The text here is from THE RANDOM HOUSE COLLEGE DICTIONARY at 1120 (rev. ed.1980); the *emphasis is added.*

18. The answer to this semantic and conceptual turmoil may be to just get out of the box imposed by the verbal reference to "representation" in the statute and caselaw. An alternative is ready at hand, in the statute's option of "false pretense":

a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to

transfer property or extend credit to the debtor. "False pretense" may, but does not necessarily, include a written or express false representation. It can consist of silence when there is a duty to speak.

*In re Anderson,* 181 B.R. 943, 950 (Bankr. D.Minn.1995) (quoting *In re Dunston,* 117 B.R. 632, 641 (Bankr.D.Colo.1990)). Quite arguably, this notion is the essence of the formulation that has to carry the day. *See In re Eashai,* 87 F.3d at 1089–1090 (omission to disclose material circumstance, creating false impression to the contrary, is misrepresentation actionable under § 523(a)(2)(A)).

tional charges and only disclosed to the holder then. Given that, no more should be attributed to the cardholder than a general intention to use the account as urged by advertising and solicitation, absent proof of something genuinely blameworthy.

> A person on the verge of bankruptcy may have been brought to that point by a series of unwise financial choices, such as spending beyond his means, and if ability to repay were the focus of the fraud inquiry, too often would there be an unfounded judgment of nondischargeability of credit card debt.

*Anastas,* 94 F.3d at 1285–1286.

█ Thus, when "the cardholder lacked an intent to repay when making certain individual charges *because he planned to shortly discharge them in bankruptcy,*" *Anastas,* 94 F.3d at 1285 (emphasis added), or when he engages in credit card kiting, using "cash advances on one credit card to make the minimum payments on another credit card[, without] intention to pay for the money, property, or services received," *Eashai,* 87 F.3d at 1088, the court may infer a concurrent intent not to pay, making the implied representation of that intent false.

The *Anastas* theory relies on the RESTATEMENT (SECOND) OF TORTS to address those objections to the notion of "implied representations" that spring from logic and semantics. 94 F.3d at 1285 (concluding, on basis of RESTATEMENT OF TORTS, § 530(1) and comment c, that making of any agreement is accompanied by an implied intention to perform in accordance with it, and an implied assertion of such intent[19]).[20] In a fairly able way, it bal-

ances the two policy goals of bankruptcy law that compete in this sort of case.

The first is the one in favor of ensuring access to bankruptcy relief as a haven from insuperable debt burdens occasioned by inadvertence, simple negligence, outright irresponsibility, and even recklessness. The other would deny that haven to those whose debts were the result of deliberate deception, wrongdoing, or connivance, and in particular to those who create such liabilities in specific contemplation of a later bankruptcy filing. The *Anastas* rationale might be accused of condoning an "empty head, pure heart" defense, but not inappropriately so. As several courts have pointed out, the creation of a whole industry based on discretionary individual draws of credit on a worldwide scale, and the activation of such facilities on a wholly-detached, impersonal, and profile-driven basis, was a voluntary exposure to the risk of irresponsible use. *In re Ward,* 857 F.2d 1082–1085 (6th Cir.1988); *First Nat'l Bank of Mobile v. Roddenberry,* 701 F.2d at 932; *In re Etto,* 210 B.R. 734 at 740.

Responsive as it is to different but equal values, the *Anastas* formulation for the nature of the representation in credit card transactions is the most balanced one, and the appropriate one to apply. Under it, the Defendant is deemed to have represented, or at least to have created the reasonable impression, that she intended to pay the Plaintiff for all of the charges and cash advances she was taking against her VISA account, in accordance with the changeable terms of repayment under the cardholder agreement, and to have made that representation each time that she was making an individual charge or cash draw.

---

**19.** The specific language from the RESTATEMENT comment on which *Anastas* relies is: The intention to perform [an] agreement may be expressed but it is normally merely to be implied from the making of the agreement. Since a promise necessarily carries with it the implied assertion of an intention to perform it follows that a promise made without such an intention is fraudulent and actionable in deceit....

**20.** In first importing the substance of common law into its statutory analysis, and then using the RESTATEMENT as a source of structure and principle, the *Anastas* court was following the lead of the Supreme Court in *Field v. Mans,* 516 U.S. at 69–75, 116 S.Ct. 437. This approach has found currency locally. *In re Moen,* 238 B.R. at 792–793; *In re Wyant,* 236 B.R. at 697.

■ The evidence simply does not establish that that representation, or impression, was false. The Defendant seems to have fooled herself into thinking that she would have the means to satisfy all of the debt she was piling up; however, neither this *self*-deception nor her concurrent financial condition go to the facts underlying the relevant representation. The Defendant's demeanor on the witness stand was subdued and shamefaced, but nonetheless credible. Her persistent belief in the salvation of the "big win" was fatuous, but there is nothing to indicate that it was not genuine. Throughout, the Defendant maintained a subjective intent to pay back everything she was borrowing from the Plaintiff—an intent that was consistently heart-whole albeit increasingly unfounded in objective fact. There was no discontinuity between her subjective intent to repay, and the representation to that effect that she is deemed to have made. Simply stated, the Plaintiff's case fails on its very first element: a false representation of a past or present fact.[21]

### 2. Intent.

■ Most of the Plaintiff's argument on the element of intent was linked to its reliance on an implied representation of ability to pay, and must fall with that theory. However, even were the threshold issue of false representation to go for the Plaintiff, its case would still fail on intent.

The Plaintiff seems to argue that an "objective" standard applies to the issue of the Defendant's intent-that is, if the Defendant's conduct in making the charges was accompanied by enough indicia that she was accumulating unmanageable debt, she must be deemed to be on notice of the falsity of her implied representation that she had the ability to pay.[22] Then, as the Plaintiff would have it, the Defendant must be deemed to have intended to manipulate this self-apparent falsehood to obtain credit that she could not later satisfy, and hence to which she was not entitled. All this, of course, was through the instrumentality of an open, revolving account with an established and high charge limit, and a very modest monthly payment obligation that would change constantly in amount.

Strictly speaking, the cases cited by the Plaintiff do not set up a true "objective" test on intent, to be governed by an imposed "reasonable person" standard. *In re Larson*, for instance, sets up a list of twelve factors that may guide a process of inference on a debtor's subjective intent. 136 B.R. at 544 (citing *In re Hinman*, 120 B.R. at 1021–1022).[23] *See also In re Lev-*

21. This formulation probably will limit success for credit card issuers under § 523(a)(2)(A) to situations where they can prove an actual, consciously-conceived plan or scheme on the part of the cardholder-debtor, contemporaneous with the charges in question—the scheme being to knowingly abuse the inherent impersonality of a credit card facility. That is not inappropriate—given the likelihood that much more credit card overcharging is generated by stupidity and self-deception than by avarice and chicanery. Bankruptcy under American law is not a hideout for the malefactor, but it still is a refuge for the irresponsible—and not inappropriately so.

22. With the Plaintiff's argument on intent summarized as such, the untenability of its theory on both elements is patent: if a representation of ability to pay is only to be inferred by a court form a cloud of surrounding circumstances long after the fact, how could even the ever-vigilant "reasonable person" of legal theory be capable of unerringly and contemporaneously recognizing it and its falsity?

23. The factors identified in *Larson* are:
   1. The length of time between the charges made and the filing of the bankruptcy;
   2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
   3. Number of charges made;
   4. The amount of charges;
   5. The financial condition of the debtor at the time the charges were made;
   6. Whether the charges were above the credit limit of the account;
   7. Whether the debtor made multiple charges on the same day;
   8. Whether or not the debtor was employed;
   9. The debtor's prospects for employment;

*enthal,* 194 B.R. 26, 28 (Bankr.S.D.N.Y. 1986). The courts have recognized other factors, including whether the debtor made payment to the card issuer after the charges in question, *In re Vermillion,* 136 B.R. at 226–227, and the process by which the cardholding relationship was formed and maintained, *In re Brawner,* 124 B.R. 762, 765 (Bankr.N.D.Ill.1991). The courts that adopt this theory recognized that no such list can be exclusive. *E.g., In re Valdes,* 188 B.R. 533, 537 (Bankr.D.Md. 1995).

▮ Whatever the label to be put on the *Larson* approach, applying an "objective" test with a "reasonable person" standard for the divination of intent is ultimately inappropriate because of the Supreme Court's dictate in *Field v. Mans* that these matters are to be guided by the principles of fraud theory under the common law. *In re Murphy,* 190 B.R. 327, 333 (Bankr.N.D.Ill.1995). Those principles direct the fact-finding away from the process of "deeming," to a determination of the actual state of mind of the defendant:

> The fact that the misrepresentation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false is not enough to impose liability upon the maker for a fraudulent misrepresentation under the rule stated in this Section, but it is evidence from which his lack of honest belief may be inferred. So, too, it is a matter to be taken into account in determining the credibility of the defendant if he testifies that he believed his representation to be true.

RESTATEMENT (SECOND) OF TORTS § 526 cmt. d (1977), quoted in *In re Murphy,* 190 B.R. at 333. *See, in general, In re Briese,* 196 B.R. 440, 451–452 (Bankr.W.D.Wis.1996).

▮ The fact-finding process on intent, then, should give service initially to the credibility of the defendant's own statements as to intent, and the defendant's other proffered evidence. *In re Kukuk,* 225 B.R. 778, 786 (10th Cir. BAP 1998); *In re Feld,* 203 B.R. 360, 368 (Bankr.E.D.Pa.1996). The factors enumerated in the case law should not wholly override the defendant's evidence. *In re Briese,* 196 B.R. at 452. The process certainly should not be directed by a tally of those factors for and against the respective parties. *In re Rembert,* 141 F.3d 277, 282 (6th Cir.1998), *cert. den.,* —— U.S. ——, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998). Nonetheless, the factors can bear on the credibility of a debtor's protestation that she always had the intent to repay. In short, while it is more free-ranging, the appropriate approach is to examine the totality of the circumstances surrounding the charges, avoiding an abstract preoccupation with "factors" and a mechanistic calculus based on them. *In re Rembert,* 141 F.3d at 282; *In re Murphy,* 190 B.R. at 334.

In the matter at bar, some of the circumstances cut in favor of a finding for the Plaintiff on the issue of intent, but the bulk of them lie in favor of the Defendant. That, and the relative credibility of her simple statements that she always intended to pay the Plaintiff end up being determinative—supporting a finding that she did not intend to obtain credit from the Plaintiff without repaying it.

Rather few of the recognized factors cut for the Plaintiff. In purest isolation, the fact that the Defendant accrued more than $8,700.00 in charges over a period of less than four months immediately before her bankruptcy filing suggests a deliberate "loading up" in contemplation of bankruptcy. The sequence of charging and filing, however, could be attributed as easily to an irresponsible but not-fraudulent spree, a sudden realization of insolvency, and

---

10. Financial sophistication of the debtor;

11. Whether there is a sudden change in the debtor's buying habits;

12. Whether the purchases were made for luxuries or necessities.

136 B.R. at 544.

even an innocent panic. The latter theory is rendered much more probable by the fact that the Defendant resumed attending Gamblers Anonymous in October, 1997, received advice to stop what she was doing, did so, and did not consult an attorney about a bankruptcy filing until after she had stopped charging to fund her gambling.

Similarly, in the luxury of isolated consideration, the large number of small charges hints at a subterfuge-the attributed notion being that a steady increase in the account balance, in small increments, would present less of a danger signal to the Plaintiff, and enable a "maxing-out" of the account. This conclusion, however, is undercut by the fact that the Defendant seems to have indulged her gambling problem over a period of months, through low-stakes gaming and cheap slot machines. These, presumably, would not require any more funding than what she actually obtained through cash draws from the Plaintiff. Besides that, a pattern characterized by one very large draw, or a small number of big ones, could just as easily evidence a strategy to load up the account, but through a "hit-and-run." Ultimately, the number and pattern of the Defendant's charges is more consistent with her theory of a blissful state of relative self-deception, than it is with a comprehensive scheme.

Again, some aspects of the Defendant's general financial condition, employment, and employment prospects could support an inference of intent not to pay: she had just failed in an attempt to parlay herself into a desired job, had only found replacement work of 35 hours per week as a stopgap measure, and had no assurance of restoring her income to its former level. On the other hand, the Defendant was clearly motivated to maintain financial in-

dependence; the job with the security firm was close to full-time in hours, though it paid less than her previous one; and she believed in good faith that she would shortly restore her prior financial means, through her concerted effort at reemployment. The Defendant did indeed charge some $700.00 above her account limit with the Plaintiff.[24] However, she did not top out her account with charges until early November, 1997, and her account statements for that month did not give her a specific advisory to that effect other than a line entry for "over limit fee" buried in its recap of transactions. The Plaintiff did not terminate her charging or cash-advance privileges at that point; the Defendant's self-imposed termination of charging was at least partly a response to her over-limit status.

On another factor, the nature and pattern of the Defendant's use of the account do not cut as strongly in favor of an inference of fraud as the Plaintiff argues. Yes, her predominant use of the account was to fund gambling. That, of course, was an indulgence, and not a necessity. However, issuers of credit on revolving charge-card accounts encourage the use of their facilities for recreational expenditures. Given the other circumstances, the sudden and accelerated usage is far more .attributable to a sudden exaggeration of the Defendant's problem, or even a spate of depression, than it was to a predatory attempt to steal the credit from the Plaintiff.

Finally, the Defendant's attempts to make good on the account reflect her ongoing sense of some responsibility to the Plaintiff, however pitiful they seem in hindsight. The voluntary payments were small in amount; sometimes they were less than required, more often they were more, and with some frequency she sent in

---

24. In a way, this was attributable to an accrual of the inflated cost of obtaining cash, imposed by the Plaintiff's and the casinos' heavy service charges. Over the life of the account, the Defendant obtained 29 different cash advances at two casinos. The casinos charged a service fee of $15.99 per advance, for a total of over $460.00. The Plaintiff also charged her fees of approximately $3.00 each for 29 cash advances, and $4.00 each for 20 more. The resulting transactional costs totaled more than $630.00.

a modest sum even though she was not required to do so. Throughout, though, these "regular" payments showed that she was conscious of the fact that she owed money to the Plaintiff. Her attempt in early 1997 to realign her debt structure through the second-mortgage transaction reduced the current balance on her account with the Plaintiff by about 75%, and shifted the burden of the component debt to her homestead. She took this step expressly to reduce the total of monthly payments on her charge cards to a level she thought she could maintain on her income at the time. Though the Defendant breached her contractual obligation of ongoing payment in the end, the timing and amount of her attempts to meet it cut against a finding that she intended to permanently deprive the Plaintiff of its rights as account creditor.

The totality of the circumstances supports a finding in favor of the Defendant on the intent issue; whatever the nature of the representation she is deemed to have made in using her VISA account, she did not intend to induce the Plaintiff to grant her credit without a corresponding subjective intent to repay it. This certainly was not an intentional runup on credit in contemplation of bankruptcy, or a kiting of charge privileges in mind of a default and absconding. Were the analysis to proceed to the second element, the Plaintiff's case would fail there as well.

### 3. Reliance

■ Because the Plaintiff's case has failed on the two elements most closely to be linked to wrongdoing on the Defendant's part, it is even less warranted to discuss the element of reliance at length. In a dischargeability proceeding based on a depersonalized and open-ended credit relationship like that on today's charge card accounts, identifying just how a creditor "relies" should be done only in focus, after a finding of active wrongdoing on the part of the account holder.

■ However, it is worth noting one thing: even were the Plaintiff's full theory on representation and intent adopted, there is *no* evidence at bar that it *actually* relied on the representations to be imputed to the Defendant. Deller testified that, when *opening* a VISA card account, the Plaintiff relies nearly completely on the credit scoring produced by its own computer software. It is unclear whether the minuscule amount of data furnished by an applicant in the tiny blanks of the "acceptance certificate" significantly push the final scoring from this process in either direction; it is pretty clear that the TRW-provided data do. In any event, as to the Plaintiff's reliance for establishing, maintaining, and increasing charging privileges, Deller testified in a general way that the Plaintiff relies on the customer's payment history on the account, "the customer's agreement to pay the charges as incurred," and initial and ongoing credit reports from TRW. The "customer's agreement" is clearly the contractual commitment entered upon the opening of the account, set forth in the "Credit Card Account Agreement." Deller made no reference to the Plaintiff considering any repeated or continuing implied representation of an intent to pay charges as incurred, or even of an ability to pay them. To the extent that the Plaintiff can credibly claim to rely on the data on a customer's ongoing general credit usage provided by Fair, Isaac & Co. when it grants charge privileges on any given transaction,[25] that is not a representation made *by the customer*. As construed in *Field v. Mans*, § 523(a)(2)(A) requires the Plaintiff to prove that it both actually and

---

**25.** Deller admitted that the great ease of credit access inherent in charge card accounts generally means that a fraudulent "loading up" to account limit is already effected by the time Fair, Isaac can issue its monthly report on the Plaintiff's customer portfolio. He also admitted that the Plaintiff ordered reports from Fair, Isaac on a quarterly basis, while it could have obtained them monthly, and that the lesser frequency was "the most cost-effective" means of monitoring.

justifiably relied on the fraudulent representations or pretenses that it identifies as the basis of its complaint. It did not prove the former, let alone the latter. The Plaintiff's proof, then, fails on a third essential element of its own articulated theory.

### 4. Defendant's Request for Award of Attorney Fees.

In her answer, the Defendant requested that she be awarded attorney fees if judgment were rendered for her on the merits. The basis for the request is 11 U.S.C. § 523(d).[26] As generally recognized, Congress enacted this provision to discourage creditors from commencing meritless dischargeability proceedings in the hope of coercing settlement from impecunious debtors who fear the costs of vindicating themselves through litigation on the merits. *In re Duplante,* 215 B.R. 444, 449 (9th Cir. BAP 1997); *In re Carolan,* 204 B.R. 980, 987 (9th Cir. BAP 1996). Under the statute, the test for determining whether a dischargeability complaint is "substantially justified" is whether the complaint had a reasonable basis in both law and fact, as revealed by an adequate pre-suit investigation. *E.g., In re Cloud,* 107 B.R. 156, 159 (N.D.Ill.1989); *In re Mack,* 219 B.R. 311, 314 (Bankr.N.D.Fla. 1998); *In re Stockard,* 216 B.R. 237, 240 (Bankr.M.D.Tenn.1997); *In re Akdogan,* 204 B.R. 90, 98 (Bankr.E.D.N.Y.1997); *In re Shurbier,* 134 B.R. 922, 927–928 (Bankr. W.D.Mo.1991).

Whether a dischargeability complaint has a "reasonable basis in law" must be measured first against the state of binding precedent. Here, simply stated, there was no such precedent; the bankruptcy jurisprudence of the Eighth Circuit Court of Appeals contains not a single opinion in a credit card dischargeability proceeding. Whether its decisions are precedential or not, the Bankruptcy Appellate Panel for the Eighth Circuit has not passed on any of the issues presented here either; neither have any of the judges of the District Court for this District, in a published opinion. The only published opinions from any of the judges of this Court are 15 years old: *In re Barnacle* and *In re Johnson,* decided in the very dawn of VISA-spawned litigation in the bankruptcy forum, and certainly not binding on a co-equal judge of the same trial court.

Given that lack, the question becomes whether the Plaintiff had a *colorable* theory of recovery. As has been noted, the caselaw in credit card dischargeability is literally all over the map.[27] True, the Plaintiff chose to adopt a theory on the elements of representation and liability that was most to its benefit as a proponent of evidence. However, as noted earlier, that theory has found numerous adherents among the trial courts in the bankruptcy forum—and the Plaintiff certainly was entitled to try to persuade another to join those ranks. Given the currency of the Plaintiff's argument in other jurisdictions, it was not without a reasonably-arguable basis in law.

Whether a dischargeability complaint has a "reasonable basis in fact" turns on whether the creditor's evidence arguably meets the elements of its theory of recovery. As noted, the Plaintiff mustered at least some evidence toward all of the elements under its formulation; had it succeeded in its legal argument, it could not

---

**26.** This statute provides:
> If a creditor requests determination of dischargeability of a consumer debt under [11 U.S.C. § 523](a)(2) ..., and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, ex-

cept that the court shall not award such costs and fees if special circumstances would make the award unjust.

**27.** One recent published decision that discussed all of the permutations of the caselaw ran to 43 pages. *In re Melancon,* 223 B.R. 300 (Bankr.M.D.La.1998).

be said that its case was not reasonably based in fact.

To be sure, the Defendant has been put out by the uncertainty, delay, and expense of this litigation; her fresh start, free of her obligation to the Plaintiff, has come at the expense of her cost of defending this adversary proceeding. She may think that unfortunate, but it can be laid at the feet of two circumstances. The first is the undeveloped state of law in this Circuit. The second is the fact that, during her charging spree, she gave just enough facts to the Plaintiff to propel its argument under its theory of recovery. *Cf. In re Carolan,* 204 B.R. at 987–988. That theory may have failed, but the Defendant must bear the cost of her own defense.[28]

### CONCLUSION

The Plaintiff has failed to prove up the grounds for excepting the Defendant's debt to it from discharge in bankruptcy; and, the Defendant has failed to establish her right to recover her attorney fees from the Plaintiff.

### ORDER FOR JUDGMENT

On the Findings of Fact and Conclusions of Law just recited,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The Defendant's debt to the Plaintiff was not excepted from the discharge in bankruptcy granted to the Defendant on March 24, 1998 in BKY 97–38186.

2. The Defendant's request for an award of attorney fees pursuant to 11 U.S.C. § 523(d) is denied.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**28.** Whether this same conclusion would be reached on the same facts in the wake of this decision is another matter entirely. The *Eashai* rationale clearly disfavors the commencement of credit card dischargeability proceedings based on a profile-driven analysis driven only by the timing, frequency, amount, and nature of pre-petition charges, and their proximity to the bankruptcy filing.