In re Becki Sue ETTO, Debtor.

FCC NATIONAL BANK dba
First Card, Plaintiff,

v.

Becki Sue ETTO, Defendant.

Bankruptcy No. 96–40850.
Adversary No. 96–4072.

United States Bankruptcy Court,
N.D. Ohio.

April 9, 1997.

Bruce R. Epstein, Youngstown, OH, for Plaintiff.

Becki Sue Etto, Youngstown, OH, for Debtor.

Robert A. Ciotola, Youngstown, OH, for Debtor.

Thomas L. Corroto, Youngstown, OH, trustee.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This cause is before the Court on the complaint of Plaintiff FCC National Bank dba First Card Visa ("Plaintiff") against Defendant Becki Sue Etto ("Defendant") seeking to determine the dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(A). At issue is whether Defendant willfully and intentionally made charges on Plaintiff's credit card with the fraudulent intent not to repay the incurred obligations. Plaintiff contends that Defendant did make such charges at a point in time when Defendant knew she would be unable to repay the obligations. Thus, Plaintiff contends that Defendant's debt from use of the credit card is nondischargeable due to fraud. Conversely, Defendant contends that she did not harbor any intent to defraud Plaintiff. Rather, Defendant asserts that she utilized Plaintiff's credit card only to purchase necessaries while be-

tween jobs and that her record of payments toward the outstanding balance evidences both her willingness and intent to repay her obligation to Plaintiff. The Court has considered the evidence and arguments of counsel and, for the reasons that follow, holds that Plaintiff has failed to satisfy the burden necessary to establish fraud under 11 U.S.C. § 523(a)(2)(A). Accordingly, Defendant's obligation to Plaintiff is dischargeable.

The Court has jurisdiction over this proceeding pursuant to the General Order of Reference entered by the United States District Court for this District and pursuant to the provisions of 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This matter was tried to the Court on March 10, 1997 and has been submitted for decision. Bruce R. Epstein, Esq. appeared for Plaintiff. Robert A. Ciotola, Esq. appeared for Defendant. The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R.BANKR.P. 7052.

## FACTS

On August 9, 1996, Plaintiff filed its complaint to determine dischargeability of a debt against Defendant asserting willful and fraudulent use of Plaintiff's credit card for the period beginning November 28, 1995 and continuing through February 24, 1996. The parties have stipulated that during this period Defendant did possess and utilize the First Card Visa ("First Card"), the credit card issued by Plaintiff. The parties have also stipulated that for the period in question, Defendant did make purchases on the credit card in the amount of $5,374.45 plus interest thereafter. Furthermore, the parties stipulated that Defendant's credit card balance was $974.99 as of November 24, 1995 and was $5,947.03 as of March 24, 1996. Copies of First Card billing statements dating from the card's inception in November 1994 through April 1996 have been submitted as evidence of Defendant's purchase and pay-

ment history. (Plaintiff's Exhibit A).[1] These statements indicate that Defendant received a pre-approved credit limit of $5,000.00 when her account was initially opened. There is no evidence that Plaintiff sought or received a credit report for or from Defendant. In addition to the stipulations of counsel, the following facts are relevant.

In 1994, Defendant reported annual earnings of approximately $8,600.00. In 1995, Defendant stated that her annual income was approximately $6,100.00. The record indicates that for these years, in addition to the 1996 tax year, Defendant's income was derived in part from her employment with the Youngstown area accounting firm of Reali, Giampetro & Scott, C.P.A. ("RGS") and in part from her receipt of $325.00 per month in unemployment compensation for the months she was not working for RGS. During these months, Defendant's unemployment compensation was her only source of income. However, for those months when she was employed by RGS, Defendant testified that her average income was $500.00 every two weeks.

Defendant testified that she was first hired by RGS in January 1993 to assist in their office during the busy 1992–93 tax season. Her employment with the firm, however, was not permanent and the need for her services ended in June. She was subsequently laid-off. The following year, in February 1994, Defendant was again hired by RGS to assist in the office during the tax season. Like the first year, her position was again terminated in June. In February 1995, RGS again hired Defendant for what would be her third consecutive tax season with the firm. Although her function was again to assist in the office during the tax season, unlike previous years, she was kept on until September 1995, three months longer than in past years.

Consistent with the firm's past hiring practices, Defendant testified that she expected to be called back to RGS in February 1996.

---

1. Counsel has stipulated to the authenticity and admissibility of Plaintiff's Exhibit A. This exhibit specifically includes First Card monthly billing statements for the period beginning November 1994 and ending April 1996. The month of February 1996 is the only month absent from this collection. To reflect billing and payment information for the period in question, Plaintiff attached to the complaint computerized printouts itemizing card activity beginning November 28, 1995 and continuing through February 24, 1996.

However, upon calling the firm in early March 1996 to discuss her return, Defendant was informed that she would not be hired that year as another individual had already been employed. Learning that RGS was not going to employ her for the 1995–96 tax season, Defendant secured work as an Avon representative. This job paid her a wage of approximately $100.00 per month. Aware that her monthly unemployment income of $325.00 coupled with the earnings from Avon would not support her daily living expenses and her required yet increasing minimum payments toward her credit card, Defendant elected to file bankruptcy. Her Chapter 7 petition was filed on April 26, 1996.

At the time of her filing, Defendant testified that her income was limited to $425.00 per month and that her monthly expenses averaged $350.00. These expenses included $250.00 per month for rent and utilities and approximately $100.00 for food and groceries. Defendant also stated that she had numerous medical expenses, however, these costs were not specified in the record. For those periods of time where Defendant was not employed by RGS, Defendant testified that she was able to cover daily living expenses by making First Card credit purchases. For example, by using the credit card to purchase "necessities" such as food (both groceries and restaurants), clothing and gasoline, Defendant said she was then able to pay the card's required minimum monthly payment using money from her $325.00 unemployment check. Review of the billing statements provided by Plaintiff in Exhibit A supports Defendant's testimony in this regard. Specifically, for a period of 15 months, beginning in December 1994 and continuing through February 1996, Defendant made all required monthly minimum payments. (Plaintiff's Exhibit A). Furthermore, Defendant tendered in November 1995 one payment to Plaintiff in the amount of $4,000.31. This payment effectively reduced her outstanding balance from $4,893.31 to $974.99 (inclusive of finance charges). Defendant's last payment on the First Card was made on January 21, 1996 in the amount of $60.00. (Plaintiff's Exhibit A).

Plaintiff argues that from November 28, 1995 through February 24, 1996, Defendant fraudulently made purchases using Plaintiff's credit card, knowing that she was unable to repay her obligations as incurred. Plaintiff further argues that Defendant harbored an intent not to repay Plaintiff for any of the obligations during this period. Accordingly, Plaintiff asserts that Defendant's outstanding obligation resulting from credit card purchases in the amount of $5,374.45 plus interest should be deemed nondischargeable pursuant to the fraud provisions of 11 U.S.C. § 523(a)(2)(A). In response, Defendant testified that at no time did she harbor an intent not to repay her obligations as owed to Plaintiff. Rather, Defendant contends that a clear showing of her intent to repay Plaintiff is evidenced by the fact that she willingly made one sizeable payment to significantly reduce her balance and continually tendered regular monthly payments to Plaintiff, although they were only for the "minimum monthly payment." Therefore, Defendant contends that because no indicia of fraud can be inferred from the factual circumstances of this case and that because the card purchases were not incurred with fraudulent intent, the obligation owed to Plaintiff should be discharged.

## DISCUSSION

### A. Standard of Review

The discharge of debts in bankruptcy under 11 U.S.C. §§ 727, 1141, 1228 and 1328(b) is subject to possible exception under 11 U.S.C. § 523(a), which provides for several categories of nondischargeable obligations. According to the Plaintiff's complaint and Defendant's response thereto, the parties agree that 11 U.S.C. § 523(a)(2)(A) governs the instant case. Subsection 523(a)(2)(A) states in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

&ast; &ast; &ast; &ast; &ast; &ast;

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's or an insider's financial condition.

When determining whether a debt comes within any of the enumerated provisions of 11 U.S.C. § 523(a), a court should construe the Code liberally in favor of the debtor and strictly against the objecting creditor. *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1083 (6th Cir.1988). The burden of proof in excepting a debt or claim from discharge rests with the objecting creditor to establish all elements of his *prima facie* case by "a preponderance of the evidence." *Grogan v. Garner*, 498 U.S. 279, 290, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991). In *Grogan*, the Court adopted the preponderance of evidence standard on the principle that this standard more accurately reflects the balance sought by Congress between a debtor's interest in a "fresh start" and a creditor's interest in recovering full payment on nondischargeable obligations. *Id.* at 286, 111 S.Ct. at 659.

■ In the present case, Plaintiff seeks a determination of Defendant's culpability under § 523(a)(2)(A) of the Code.[2] Specifically, § 523(a)(2)(A) disallows as an exception from discharge any money, property, services or *credit* obtained by either false pretenses or actual fraud which a creditor relied upon when entering into a transaction with the debtor. When determining whether a creditor has satisfied the elements of a claim arising under § 523(a)(2)(A), the Court of Appeals for our Circuit has held as follows:

It is well established that in order to except a debt from discharge under section 523(a)(2)(A) "the creditor must prove that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of the loss."

*Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 961 (6th Cir.1993) (citations omitted). *See also In re Ward*, 857 F.2d 1082, 1083 (6th Cir.1988); *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir.1986). Although the above standard is the precedent to be followed, this standard was recently modified by the United States Supreme Court in *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).[3] Settling the question concerning what degree of reliance should be applied by bankruptcy courts when excepting a debt because of false pretenses, a false representation or actual fraud under 11 U.S.C. § 523(a)(2)(A), the Court in *Mans* held that the proper standard is not "reasonable reliance but the less demanding one of *justifiable* reliance on the representation." *Id.* at ——, 116 S.Ct. at 439 (emphasis added).[4] Relying upon Congress' historical interpretation and statutory incorporation of the RESTATEMENT (SECOND) OF TORTS (1976), the Court made the following distinction between "reasonable" versus "justifiable" reliance:

Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must

---

**2.** Although § 523(a)(2)(B) is frequently raised as an alternative claim in bankruptcy cases, this subsection is limited in application to situations involving allegations of fraud or misrepresentation procured through a written statement pertaining to a person's financial condition. However, because the instant case does not involve a written misrepresentation of Defendant's financial condition, as might have been the case had Defendant completed a credit card application that detailed her financial condition, § 523(a)(2)(B) is not applicable here.

**3.** In *Mans*, creditors filed an adversary complaint under Chapter 11 seeking to except from discharge a debt which arose as the result of material misrepresentations appearing in several letters written by a debtor. These letters failed to

accurately disclose to the lending creditor the conveyance by the debtor of certain real property. The Supreme Court held that by applying the reasonable person test entailing a duty to investigate, the bankruptcy court exceeded the demand of justifiable reliance. *Id.* at —— – ——, 116 S.Ct. at 446–47.

**4.** By contrast, when reviewing exceptions to discharge under 11 U.S.C. § 523(a)(2)(B), the Supreme Court stated that the proper standard of reliance to be applied is not only reasonable reliance, but reliance itself. The Court also reiterated that any claim averring reliance under § 523(a)(2)(B) must show that the material misrepresentation at issue was the result of a debtor's intent to deceive. *Mans* at ——, 116 S.Ct. at 442.

conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.

*Mans* at ——, 116 S.Ct. at 444 (citing RESTATEMENT (SECOND) OF TORTS, § 545A, Comment b (1976)). The Court went on to hold that claims brought under either § 523(a)(2)(A) or (B) are to be decided independently on their facts. With this directive, we turn to an analysis of the facts and issues before us.

### B. Analysis

The complaint posits that Defendant intentionally and willfully intended to defraud Plaintiff by not repaying her credit card obligations as incurred. Specifically, the complaint states that Defendant was "insolvent at the time of [her credit] purchases" and that because her "expenses exceeded [her] income," Defendant "had no ability and/or intention of repaying to FCC the amount of said purchases." (Complaint at ¶¶ 7 and 8). The complaint also posits that Plaintiff relied on the representation of Defendant "to repay any and all charges incurred by them on said credit card account, in extending credit to Defendant." (Complaint at ¶ 9). Thus, Plaintiff contends that the debt owed by Defendant "represents money, property, services, or an extension, renewal, or refinancing of credit obtained by false pretenses and/or false representations, and is therefore dischargeable." (Complaint at ¶ 12). Upon consideration of the facts before us, the Court finds Plaintiff's arguments to be both unsubstantiated and misguided.

■ Following the guidelines announced in *Grogan v. Garner, supra,* Plaintiff carries the burden to establish that Defendant's debt to Plaintiff was incurred through fraud in violation of 11 U.S.C. § 523(a)(2)(A). Plaintiff must establish by a preponderance of the evidence that the debt arising from Defendant's use of the First Card was incurred by either false pretenses, a false representation or actual fraud. *See In re McLaren,* 3 F.3d at 961; *In re Begun,* 136 B.R. at 494. A

"false pretense" involves an implied misrepresentation or conduct intended to create or foster a false impression. *In re Cole,* 164 B.R. 951, 953 (Bankr.N.D.Ohio, 1993) (citing *In re Begun,* 136 B.R. 490 (Bankr.S.D.Ohio 1992)); *In re McCoy,* 114 B.R. 489, 490 (Bankr.S.D.Ohio 1990). By comparison, a "false representation" involves an expressed misrepresentation by a debtor. *In re Begun, id.* (citing *In re Dunston,* 117 B.R. 632, 639–40 (Bankr.D.Colo.1990)). On the other hand, "actual fraud" has been defined to include a "deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *In re Cole,* 164 B.R. 951, 953 (Bankr.N.D.Ohio 1993) (citing *United States v. Lichota,* 351 F.2d 81 (6th Cir.1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966)).

■ Upon review of the record as a whole, the evidence fails to support a finding that Defendant in any instance misrepresented to Plaintiff her ability to repay her debt or conducted herself in a manner sufficient to establish that she harbored an intent not to repay her obligations to Plaintiff. To that effect, the record is void of any evidence of false pretenses, false misrepresentations or fraud. Furthermore, Plaintiff failed to put on any evidence to support its claim of detrimental reliance upon either the representations or the conduct of Defendant. Without further evidence to the contrary, Defendant's use of Plaintiff's credit card to subsidize her daily living expenses, though imprudent, did not constitute fraudulent conduct.

■ In reaching this conclusion, the Court considered several factors, the most notable being that this case centers upon a creditor's attempt to enforce the collection of an unsecured debt incurred by a debtor's use of an *unsolicited and pre-approved* credit card. In short, Plaintiff, as creditor, willingly issued to Defendant a pre-established line of credit without requiring Defendant, as debtor, to complete any application setting forth her finances. Nor is there any evidence to indicate that Plaintiff made efforts to investigate Defendant's credit status prior to issuing her the card. In this regard, Plaintiff failed at trial to establish that Defendant in

fact made any kind of representation to Plaintiff concerning her inability or lack of intent to repay credit charges as incurred. Rather, Plaintiff contends that such representation arose by implication—that Defendant's *actual use of the card* constituted an enforceable implication that she agreed to be bound by the terms and conditions of repayment. The Court disagrees and refuses to adopt Plaintiff's theory.

■ In this Circuit, the law is clear that banks have a responsibility to conduct reasonable investigation of a debtor's finances prior to extending loans or credit. In *In re Ward*, 857 F.2d 1082 (6th Cir.1988), the Sixth Circuit held that a credit card company's reliance upon a debtor's representation stating that the debtor could and would repay debts as incurred was unreasonable as a matter of law absent evidence that the company conducted even a superficial investigation. *Id.* at 1084. Although *In re Ward* concerned information supplied by the debtor on a credit card application, the Court nevertheless addressed the issue presently before this Court—whether *credit card use alone constitutes* a representation of a debtor's intent to repay. The Court stated: "[E]ven if each credit card charge constituted a 'representation' of ability to pay, the case law and legislative history make it clear that a credit check must be conducted at some point; otherwise an exception to discharge is unavailable." *Id.* at 1085. The Court set forth that a contrary policy would " 'place credit card companies in a special category of creditors and makes their [credit card] debts too easily nondischargeable.' " *Id.* (*quoting In re Carpenter,* 53 B.R. 724, 728 (Bankr.N.D.Ga. 1985)). The Court further determined that a creditor's failure to perform a credit check was analogous to "assumption of the risk" and, therefore, rejected "extending preferential protection, at the expense of other unsecured creditors, to credit card companies which profit from extending consumer credit at the risk of non-payment, which risk is factored into finance charges which are higher than the rates charged by other lenders." *Id.*

Plaintiff herein is a creditor to be governed by the principles set forth above. Defendant's testimony revealed that she received an unsolicited, pre-approved credit card from Plaintiff. Defendant's recollection further suggests that she signed no forms or applications which misrepresented to Plaintiff her financial condition or ability or intent to repay charges as incurred. Rather, the evidence shows Defendant intended to repay the debt in installments over time. Furthermore, Plaintiff put on no evidence to rebut Defendant's testimony. No reference was made to an application or even to a brochure or mailing insert outlining the terms and conditions governing use of the First Card, nor were witnesses called to counter Defendant's claim that she received an unsolicited, pre-approved card. Absent such evidence, it appears that Plaintiff had little concern as to Defendant's ability or intent to repay debts and, therefore, accepted the risk of non-payment. " '[W]hen a credit card company issues a credit card with no credit check of the applicant it has made a calculated business decision to assume the risk of nonpayment. Such a company cannot now turn to this Court and ask for special consideration because the debt owed is being discharged in bankruptcy.' " *In re Ward,* 857 F.2d at 1085 (*quoting In re Carpenter,* 53 B.R. at 729).[5] *See also In re Bridges,* 51 B.R. 85 (Bankr. W.D.Ky.1985) (holding that "[a] creditor who ignores available information or who fails to seek information from sources that are commonly used should not be heard to complain about the debtor's fraud").

As the Court is not convinced under these facts that Defendant's mere use of Plaintiff's credit card alone carries with it an implication of a promise to repay Plaintiff, the Court is similarly not convinced that Defendant harbored an intent to deceive Plaintiff. Rather, review of the record indicates the

---

5. Case law from this Circuit is abundant with decisions that speak to a creditor's duty to conduct, at minimum, a reasonable investigation of a debtor's financial condition. *See In re Rosel,* 63 B.R. 603, 606 (Bankr.W.D.Ky.1986) (holding creditor's reliance to be unreasonable where no effort was made by bank to verify the accuracy or existence of debtor's represented debts or assets); *In re Bright,* 57 B.R. 233, 235 (Bankr.N.D.Ohio 1986) (holding that a creditor has a duty to make reasonable inquiry as to information debtor provides on a financial statement).

contrary. In particular, the Court has no reason to doubt Defendant's testimony regarding the importance to her of maintaining "good credit." Defendant's conviction in this regard is supported by the credit card statements in evidence which illustrate her ability to make timely and regular payments toward her First Card obligations, despite the fact that her payments were only for the minimum amount required. For the period beginning November 24, 1994 through February 24, 1996, Defendant missed no payments and all payments tendered complied with Plaintiff's express allowance for a "minimum payment due." (Plaintiff's Exhibit A). Furthermore, on November 18, 1995, Defendant tendered to Plaintiff one payment in the amount of $4,000.31 to be applied against her balance due. Defendant testified that the payment was made in connection with a loan consolidation effort between herself and another creditor.

[redacted] Because debtors rarely will openly disclose any indication of deceitful conduct, proving deceptive intent is likely the most difficult aspect of establishing a successful case under 11 U.S.C. § 523(a)(2)(A). *See In re Phillips,* 804 F.2d 930, 932 (6th Cir.1986). Accepting this fact, even had Plaintiff established that Defendant's credit card use alone constituted an implied representation to repay Plaintiff for the incurred obligations, the weight of the evidence when viewed as a whole, including consideration of circumstantial evidence, fails to support a finding of willful or fraudulent intent to deceive Plaintiff. *See In re Begun,* 136 B.R. 490, 496 (Bankr.S.D.Ohio 1992) (citations omitted). Thus, in the absence of proof showing an intent to operate under false pretenses or false representations, there can be no finding of fraud under 11 U.S.C. § 523(a)(2)(A).

## CONCLUSION

Based upon review of the record before us and for the reasons set forth herein, the Court concludes that Plaintiff has failed to satisfy the requisite elements of fraud required by 11 U.S.C. § 523(a)(2)(A). Accordingly, the Court holds that Defendant's obligation to Plaintiff is dischargeable.

An appropriate order shall issue.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion entered this date, the obligation of Defendant Becki Sue Etto to Plaintiff FCC National Bank dba First Card Visa is dischargeable.

**IT IS SO ORDERED.**