**In re Larry R. EGGLESTON and Carroll A. Eggleston, Debtors.**

**Kansas Bankers Surety Co., Plaintiff,**

**v.**

**Larry R. Eggleston, Defendant.**

**Bankruptcy No. 99–41650.**
**Adversary No. 99–4228.**

United States Bankruptcy Court,
W.D. Missouri,
Western Division.

Jan. 7, 2000.

William F. Logan, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

The Debtors, Larry R. Eggleston and Carroll A. Eggleston, filed for protection under Chapter 7 of the Bankruptcy Code on April 27, 1999. Kansas Bankers Surety Company ("KSBC"), a creditor not listed on the Debtors' Schedules, filed a proof of claim in the Debtors' bankruptcy case on May 25, 1999, for $141,750.00.[1] The claim arises as a result of losses suffered by Clayco State Bank that were allegedly caused by Larry R. Eggleston during his employment at that bank. Kansas Bankers Surety Company now seeks to have the $174,750.00 debt owed to it determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4), and (6). It filed a Complaint to determine dischargeability on June 11, 1999, and a hearing on the matter was held on December 8, 1999, at the federal courthouse in Kansas City, Missouri. The Debtors, without explanation, failed to appear at the hearing, and the Plaintiff was allowed to present its case.

Upon consideration of the pleadings submitted, evidence adduced at trial, and relevant law, the Court is now ready to rule.

The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334(b) and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (I). The following constitutes the Court's findings of fact and conclusions of law. Fed.R.Bankr.P. 7052.

## BACKGROUND

1. Procedural Background

The Plaintiff filed its original Complaint on June 11, 1999, seeking recovery of

---

**1.** Subsequent to filing its proof of claim and original Complaint, the Plaintiff amended its Complaint to reflect additional damages in the amount of $33,000.00, for a total claim of $174,750.00. The Court assumes that an amended proof of claim will also be filed.

$141,750.00 for losses suffered by Clayco State Bank in the Debtor's nominee-loan scheme which is described in more detail below. Then, on September 20, 1999, the Plaintiff filed a Motion asking leave to file a First Amended Complaint to include an additional $33,000.00 in losses that had been paid by KBSC in July 1999 on two nominee-loans that were not included in the original Complaint, because claims had not been made by the Bank on those nominee loans until after the original Complaint was filed. The Court granted leave to file the First Amended Complaint over the objection of the Debtor. Subsequently, Bruce E. Strauss, the attorney for the Debtor, sought leave to withdraw as counsel for the Debtor on grounds that the Debtor refused to cooperate with Mr. Strauss and was not paying Mr. Strauss for his legal representation. The Court allowed Mr. Strauss to withdraw as counsel for the Debtor after Mr. Strauss filed an Answer to the First Amended Complaint, and on the condition that Mr. Strauss notify the Debtor of the trial date. Mr. Strauss advised the Court that he had informed the Debtor of the trial date, but nonetheless the Debtor failed to appear for the trial hearing on December 8, 1999.

2. Factual Background

This case presents a sad tale of deception and betrayal. Over the course of 14 years, the Debtor, Larry R. Eggleston ("Eggleston" or "Debtor"),[2] obtained over $200,000.00 by convincing his "friends" to take out loans from the banks where he worked and turn the money over to him. Eggleston promised to pay off the loans before they came due, but never kept this promise. In technical parlance, these loans are called "nominee" loans, and Eggleston's nominee-loan scheme played out as follows: Eggleston would approach an individual, usually someone who trusted him because of an existing relationship, and ask him or her for help in obtaining a loan from the bank. Eggleston would explain to the individual that he needed the money quickly,[3] and that it would be quicker using this method, i.e., a nominee-borrower, than if he applied for the loan himself, which would take a lot of time and a lot of "red tape" because Eggleston was an employee and officer of the bank. Eggleston assured the nominee-borrowers that they would not be responsible for the loans because he would repay them before they came due.[4] He would also tell the nominee-borrowers that they should not tell anybody about their arrangement and should definitely not talk about the loans at the bank, except to him in his office. Once the loan check was issued, Eggleston would have the nominee endorse the check over to him. The nominee-borrowers never took control over the funds, and some never even saw the front of the loan check. Apparently, Eggleston never made a single principal payment on any of the loans. He did, however, do everything in his power to keep the loans from going into default, the likely reason being that if the

2. The instant proceeding was brought against only one of the co-debtors, Larry R. Eggleston. There has been no suggestion, by either of the parties, that Carroll A. Eggleston, Larry's wife and co-debtor, was involved in any way with the transactions at issue here.

3. The testimony of the nominee-borrowers suggests that there were a few excuses that Eggleston recycled, including needing money for his son's college education and for payment of his wife's medical bills.

4. Eggleston contends that he told the nominee-borrowers that the obligation to pay the bank was conditioned upon Eggleston's re-

payment to them; i.e., he would repay the borrowers and they would repay the bank. The Plaintiff contends, and the borrowers who testified confirmed, that this was not the case; as it actually played out, the arrangement was that Eggleston was to repay the bank directly. The distinction is largely irrelevant, inasmuch as the critical feature of an illegal nominee-loan is the bank officer's assurance to the borrowers that they are not responsible for the loan. In fact, Eggleston's characterization of the scenario provides additional substantiation of his intent to deceive the Bank and his disregard of the Bank's interest.

loans went into default, attention would be drawn to the loans and his chicanery would be discovered. Eggleston did this by making interest payments with his own money, when he could, and when he couldn't, he took funds directly out of the nominee's bank account, and in the case of Darrell Moritz, out of the nominee's wife's bank account because the nominee's own account balance was insufficient to cover the payment. Eventually, Eggleston's scheme was discovered, as they usually are, and the victims, each thinking that he or she was the only one to have fallen prey to Eggleston's deception, found out that they were one of many who were ensnared in Eggleston's web of deceit.

Having reviewed Eggleston's scheme in general terms, we now move to the particular. For the sake of brevity and because Eggleston's modus operandi (M.O.) was substantially the same for all of the nominee-"loans," we limit our recitation to two representative instances of Eggleston's deception. The experiences of Dennis Carter and Michael J. Baker, with few changes, mirror the experiences of all of Eggleston's "victims" (enumerated in the Plaintiff's First Amended Complaint) and illustrate how Eggleston accomplished what he did and why he should not be discharged from his debt to the Plaintiff.

*1. Dennis Carter*

Dennis Carter ("Carter") knew Eggleston long before Eggleston approached him with his first request for assistance with a loan in 1985. Carter testified that Eggleston was a trusted, lifelong friend, to the extent that Carter considered him an uncle, "or closer." But, in 1985, Eggleston's and Carter's relationship took on a new, troubling dimension.

From 1978 to January 1992, Eggleston was a loan officer at the Commercial Bank of Liberty ("Commercial"), the same bank where Carter did most of his banking. In 1985, Eggleston asked Carter to obtain a $12,500.00 loan from Commercial for him. Eggleston explained that he needed money

quickly and that he would be able to bypass a lot of red tape if Carter "helped him out." He told Carter that their agreement had to be confidential because if anyone found out about it, he could "get in trouble." Carter went as far as saying that Eggleston "forbade" him from talking to anyone at the bank about it. Eggleston promised to repay the loan immediately but never did, despite numerous demands by Carter.

In January 1992, Eggleston left his position at Commercial for a job at Clayco State Bank ("the Bank"). He served as the Bank's Chief Executive Officer and sat on the Bank's board of directors from May 1992 to July 1998 when he was terminated as a result of his nominee-loan scheme. Shortly after moving to Clayco State Bank, Eggleston suggested to Carter that they take out another loan to pay off the note at Commercial. Carter agreed because "he had no choice;" Carter didn't have the funds to repay the loan and Eggleston continued to refuse to pay it off himself. Subsequently, Carter had to execute a number of extension agreements on the loan. Eggleston would hand him a blank agreement and Carter would sign it, again because he "had no choice."

Carter also had trouble getting Eggleston to make interest payments on the loan. He testified that although Eggleston "sometimes" made interest payments with his own money, he also took money from Carter's account, without telling him, to make the payments. Other times, Carter had to make the interest payments himself to avoid default.

In late 1997, Carter discovered that Eggleston had used a number of other people to obtain similar loans from the Bank. Alarmed, Carter confronted Eggleston and obtained a promissory note from him since nothing had been in writing up to that point. Not surprisingly, Eggleston has not made a payment on that note, either.

### 2. Michael J. Baker

Michael J. Baker ("Baker") met Eggleston approximately 28 years ago when he and Eggleston were working at a company that handled car loans, called Interstate Finance. Baker also banked at Commercial while Eggleston worked there but was not approached by him until August 1992, after Baker obtained a home loan from Clayco State Bank. At that time, Eggleston asked Baker for a $6,200.00 loan because "he needed the money quickly and wanted to cut through a lot of red tape." He told Baker to keep it confidential, "between us," and that Baker didn't have to worry about the note because he would pay it before it came due. Baker agreed to take out the loan and he endorsed the check over to Eggleston. Eggleston gave Baker a handwritten note on the same day memorializing his obligation to Baker.

From 1992 to 1996, Eggleston obtained two more loans through Baker in much the same manner: On June 29, 1995, he asked Baker for help with a $6,000.00 loan and assured him that he would pay it back soon because "he had some money coming," and on December 11, 1996, Eggleston had Baker sign a blank promissory note which was later made out for $6,000.00. Baker apparently also made a personal loan to Eggleston on May 4, 1998, for $24,200.00,[5] because Eggleston said he needed money to save his brother's house. Baker later learned that this excuse was false.

Although Eggleston never made a payment on the principal on any of the loans, in contrast to the loans made through Carter (and many of the other victims), Eggleston made all of the interest payments on Baker's loans.[6] The manner in which he made interest payments deserves attention, though. According to Baker, Eggle-

ston would hand the cash to Baker and then immediately take it back from him, and would pay the interest required to a bank teller. Apparently, he engaged in this charade not for the purpose of having Baker count the money, but more as if this ritual magically transformed the payment into one coming from the true borrower of record rather than from Eggleston.

### DISCUSSION

In its Complaint, Plaintiff KSBC alleges seven different "grounds" for the nondischargeability of the $174,750.00 debt owed to it by the Debtor, although only three Code sections are implicated. Counts I and II make claims under 11 U.S.C. § 523(a)(2)(A) and allege fraudulent misrepresentation and actual fraud, respectively. Counts III, IV, V, and VI make claims under 11 U.S.C. § 523(a)(4) and allege defalcation while acting in a fiduciary capacity, fraud while acting in a fiduciary capacity (in both Counts IV and V), and "embezzlement or larceny," respectively. Count VII makes a claim under 11 U.S.C. § 523(a)(6) and alleges that the Debtor's actions constituted a willful and malicious injury. In order to prevail on any of these claims, the Plaintiff must establish, by a preponderance of the evidence, all of the elements required therein. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (preponderance of the evidence standard applies to § 523 claims). The exceptions to discharge in § 523(a) are to be strictly construed in favor of the debtor. *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 853 (8th Cir.1997).

We now turn to a detailed discussion of each Count of the Plaintiff's Com-

---

**5.** It is unclear from the evidence whether the promissory notes evidencing this loan represented an entirely new loan or incorporated amounts already due and owing.

**6.** One could imagine that the reason Eggleston always made interest payments on Baker's loans was that he didn't want to trouble or offend Baker, someone who continued to go along with his scheme, time after time, in spite of Eggleston's failure to make principal payments.

plaint, grouped by underlying Code section.[7]

### 1. Counts I & II—11 U.S.C. § 523(a)(2)(A).

■ Counts I and II of Plaintiff's Complaint allege different "grounds" for non-dischargeability—fraudulent misrepresentation and actual fraud—but both are based on the same Code section, 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) provides that no debt shall be discharged if it is "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud ..." 11 U.S.C. § 523(a)(2)(A). Although some courts have drawn distinctions among the three offenses,[8] many courts have determined that there is no significant difference. *See, e.g., Bombardier Capital, Inc. v. Baietti (In re Baietti)*, 189 B.R. 549, 553 (Bankr.D.Me.1995); *Thorp Credit and Thrift Co. v. Pommerer (In re Pommerer)*, 10 B.R. 935, 938 (Bankr.D.Minn.1981); 3 NORTON BANKRUPTCY LAW AND PRACTICE 2d 47:14 n. 98 (1994). Courts in this jurisdiction have not clearly identified a position on this issue, but appear to lean toward an application of the single action test of actual fraud for all claims made under § 523(a)(2)(A).[9] *AT & T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326, 333 (Bankr.W.D.Mo.1997). Because we find that the debtor's actions constitute fraud under the test for actual fraud, which incorporates the conduct of fraudulent misrepresentation as defined by the courts

7. The unique circumstances of the transactions at issue require us to spend a moment to clarify the means by which KSBC has standing to pursue its Complaint against the Debtor. Most transactions that give rise to § 523(a)(2)(A) claims are two-party affairs; a debtor fraudulently obtains property, credit, etc., directly from a single creditor, and the offended creditor brings the nondischargeability action himself or herself. The instant case presents two slight twists on the usual scenario: The action presently before the Court was brought by the bank's (from which the money was borrowed) surety, the subrogee of the bank's claim, and the property that was fraudulently obtained was, from a technical standpoint, obtained not from the bank, but from the nominee-borrowers who endorsed their loan checks over to the Debtor.

Neither one of these twists presents a barrier to KSBC bringing the instant action. It is well established that a subrogee has the right to assert a subrogor's right to have a debt declared nondischargeable under § 523(a)(2), (4) and (6), *see Attorneys Title Insurance Fund, Inc. v. Lottes (In re Lottes)*, 226 B.R. 634, 637 (Bankr.E.D.Mo.1998); *S.J. Groves & Sons Company v. Peters (In re Peters)*, 90 B.R. 588, 604 (Bankr.N.D.N.Y.1988) (listing cases), and the fact that the money obtained by the Debtor was technically the nominee-borrower's is of little significance when the substance and ultimate result of the transaction is considered. *See Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939) (In bankruptcy court, "fraud will not prevail ... substance will not give way to form ... [and] technical considerations will not prevent substantial justice from being done."). The nominee-borrowers were merely conduits for the money, and the Debtor only used them to achieve his ultimate goal, which was to fraudulently obtain money *from the bank*. The Court does note, however, that each of the nominee-borrowers might have had a § 523 action against the Debtor in their own right as well.

8. *See e.g., F.C.C. National Bank v. Reid (In re Reid)*, 237 B.R. 577, 586 (Bankr.W.D.N.Y. 1999) ("[T]he term 'actual fraud' encompasses not only five-pronged common law deceit, but also any device, trick, artifice or scheme to defraud ... the cases that hold that the five prongs of common law deceit are always indispensable to a § 523(a)(2)(A) judgment ... are ... mistaken."); *F.C.C. National Bank v. Etto (In re Etto)*, 210 B.R. 734, 735–36 (Bankr.N.D.Ohio 1997) (defining false pretense as an implied misrepresentation or conduct intended to create or foster a false impression; a false representation as an express misrepresentation by a debtor; and actual fraud as a deception intentionally practiced to induce another to part with property or surrender some legal right).

9. Under the single action test, the Court applies the same test to all actions brought under § 523(a)(2)(A), regardless of whether a creditor alleges false pretenses, false representation, or actual fraud. *AT & T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724, 729 (Bankr.N.D.Ill.1996).

that have made a distinction,[10] the distinction is academic and need not be decided here.

■ Therefore, in order to prevail on Count I *or* Count II, the Plaintiff has the burden of proving that: (1) the debtor made a false representation; (2) at the time the representation was made the debtor knew it was false; (3) the debtor subjectively intended to deceive the creditor at the time he made the representation; (4) the creditor justifiably relied upon the representation; and (5) the creditor was damaged. *Id.* Upon consideration of the evidence, the Court finds that the Plaintiff has met this burden.

a. The Debtor made a false representation.

Eggleston's conduct involved making two kinds of false representations, one affirmative and one silent. On one hand, Eggleston made affirmative representations to the Bank every time he processed one of the nominee-loans. He affirmatively represented that the borrower of the money was the nominee, when in fact he was the true recipient of the loan proceeds, and he affirmatively represented that the entire "loan agreement" was embodied in the promissory note,[11] but, according to the borrowers' testimony, Eggleston's promise to repay the loan before it became due was part of the agreement. On the other hand, Eggleston made silent representations by failing to disclose to the Bank that he was the true borrower and by failing to properly apply for the loans.

■ It is well established that a debtor's silence as to a material fact or when there is an affirmative duty to speak constitutes a representation for the purposes of finding fraud under § 523(a)(2)(A), *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir.1987); *In re Lett*, 238 B.R. 167, 184 (Bankr.W.D.Mo.1999), and in this case, the Debtor was required to speak by federal statute and by the Bank's own regulations. Federal statutes 12 U.S.C. §§ 375a, 375b and 12 C.F.R. § 215, *et seq.* (Regulation O), require that a bank officer who is seeking a loan from his or her own bank submit "a detailed current financial statement," report the loan to the bank's board of directors, obtain prior approval for loans to one individual totaling over $25,000 (a figure far exceeded by Eggleston), and generally be subject to the same terms as all bank customers.[12] According to the testimony of the current CEO of Clayco State Bank, Patricia Estes, the Bank also has a written

---

**10.** *See, e.g., F.C.C. National Bank v. Gilmore (In re Gilmore)*, 221 B.R. 864, 871 (Bankr. N.D.Ala.1998).

**11.** The promissory note for each nominee-loan contained a phrase stating that the terms of the loan were contained on the front and back (or pages one and two) of the agreement. Although the back (or page two) of the agreements was not submitted in evidence, the Court may safely assume that Eggleston's promise to repay the loan in place of the named borrower was not written there.

**12.** 12 U.S.C. § 375a. Loans to executive officers of banks

(1) General prohibition; authorization for extension of credit; conditions for credit Except as authorized under this section, no member bank may extend credit in any manner to any of its own executive officers. No executive officer of any member bank may become indebted to that member bank except by means of an extension of credit

which the bank is authorized to make under this section. Any extension of credit under this section shall be promptly reported to the board of directors of the bank, and may be made only if—

(A) the bank would be authorized to make it to borrowers other than its officers;

(B) it is on terms not more favorable than those afforded other borrowers;

(C) the officer has submitted a detailed current financial statement; and

(D) it is on condition that it shall become due and payable on demand of the bank at any time when the officer is indebted to any other bank or banks on account of extensions of credit of any one of the three categories respectively referred to in paragraphs (2), (3), and (4) in an aggregate amount greater than the amount of credit of the same category that could be extended to him by the bank of which he is an officer.

12 C.F.R. § 215.4 (Regulation O) General prohibitions.

(a) Terms and creditworthiness—

policy that requires a bank officer who is seeking to obtain a loan for himself or herself to apply for the loan in the same manner as other customers, including the submission of a detailed disclosure of financial information, and to obtain prior approval from the board of directors for the loan. Eggleston, an officer of Clayco State Bank, obtained numerous loans from the Bank, albeit through nominee conduits, but was silent in the face of all the disclosure requirements.

b. At the time the representation was made the Debtor knew it was false.

There is no question that Eggleston knew the representations he made to the Bank were false at the time he made them. In addition to the fact that he knew that the borrowers named in each of the loans were not the true borrowers of the money, Eggleston, by his own admission (related via deposition testimony read at trial), stated that at the time of the loans at issue he knew about the regulations requiring him to disclose and obtain approval for loans to bank officers.

c. The Debtor subjectively intended to deceive the creditor at the time he made the representation.

In most cases proceeding under § 523(a)(2)(A), courts infer a debtor's in-

(1) In general. No member bank may extend credit to any insider of the bank or insider of its affiliates unless the extension of credit:

(i) Is made on substantially the same terms (including interest rates and collateral) as, and following credit underwriting procedures that are not less stringent than, those prevailing at the time for comparable transactions by the bank with other persons that are not covered by this part and who are not employed by the bank; and
***

(b) *Prior approval.*

(1) No member bank may extend credit (which term includes granting a line of credit) to any insider of the bank or insider of its affiliates in an amount that, when aggregated with the amount of all other extensions of credit to that person and to all related interests of that person, exceeds the higher of $25,000 or 5 percent of the member bank's unimpaired capital and unimpaired surplus, unless:

(i) The extension of credit has been approved in advance by a majority of the entire board of directors of that bank; and

(ii) The interested party has abstained from participating directly or indirectly in the voting.

12 C.F.R. § 515.5 (Regulation O) Additional restrictions on loans to executive officers of member banks.
***

(c) A member bank is authorized to extend credit to any executive officer of the bank:

(1) In any amount to finance the education of the executive officer's children;

(2) In any amount to finance or refinance the purchase, construction, maintenance, or improvement of a residence of the executive officer, provided:

(i) The extension of credit is secured by a first lien on the residence and the residence is owned (or expected to be owned after the extension of credit) by the executive officer; and

(ii) In the case of a refinancing, that only the amount thereof used to repay the original extension of credit, together with the closing costs of the refinancing, and any additional amount thereof used for any of the purposes enumerated in this paragraph (c)(2), are included within this category of credit;

(3) In any amount, if the extension of credit is secured in a manner described in § 215.4(d)(3)(i)(A) through (d)(3)(i)(C) of this part; and

(4) For any other purpose not specified in paragraphs (c)(1) through (c)(3) of this section, if the aggregate amount of extensions of credit to that executive officer under this paragraph does not exceed at any one time the higher of 2.5 per cent of the bank's unimpaired capital and unimpaired surplus or $25,000, but in no event more than $100,000.

(d) *Any extension of credit by a member bank to any of its executive officers shall be:*

(1) *Promptly reported to the member bank's board of directors;*

(2) In compliance with the requirements of § 215.4(a) of this part;

(3) Preceded by the submission of a detailed current financial statement of the executive officer; and

(4) Made subject to the condition in writing that the extension of credit will, at the option of the member bank, become due and payable at any time that the officer is indebted to any other bank or banks in an aggregate amount greater than the amount specified for a category of credit in paragraph (c) of this section. (emphasis added)

tent to deceive from the surrounding circumstances because direct evidence of intent is generally unavailable. *In re Van Horne*, 823 F.2d at 1287. In the present case, however, direct evidence of the Debtor's intent to deceive the bank was available in addition to ample circumstantial evidence supporting the same conclusion.

Nearly every nominee-borrower who testified said that Eggleston told him or her not to tell anybody about their loan "arrangement." Some testified that he just told them not to talk about it in the bank or to other bank personnel, a request that could be interpreted merely as a desire to keep his financial dealings private. But Eggleston told at least one nominee-borrower, Dennis Carter, that if their arrangement was discovered, he (Eggleston) would get in trouble, and he *forbade* another, Michael Baker, from talking to anyone at the Bank about the arrangement. These statements are direct evidence that Eggleston intended to keep something secret from the bank for personal gain; in other words, direct evidence of his intent to deceive.

Eggleston's entire scheme hinged upon his ability to deceive the Bank as to the true identity of the borrower, and viewed from this perspective, every action that he took in regard to the nominee-loans reinforces the inference that Eggleston had the intent to deceive. First, there was the vow of silence he exacted from the nominee-borrowers, already discussed above. Then, there was the manner in which he processed the loan. According to the testimony of the nominee-borrowers, Eggleston went out of his way to conduct the transaction quickly and with minimum involvement from the nominee. After the loan documents were signed in his office, he retrieved the loan check and immediately had the nominee endorse the check,

sometimes without even showing the front of the check. The extension agreements were handled in much the same fashion in that Eggleston would often have the nominees sign their names to blank forms and he would fill in the necessary information later. Needless to say, the extensions were all done at Eggleston's request and not at the request of the nominee-borrowers.

Finally, and perhaps most telling, was the way in which Eggleston dealt with the interest payments on the loans. Keeping the loans from going into default was crucial to Eggleston's deception; if a number of the loans had suddenly gone into default, it would have drawn significant and unwanted attention to his scheme. In order to stave off detection, Eggleston did everything in his power to keep the interest payments current. When he had money, he made the interest payments himself.[13] When he didn't have the money, which was apparently quite frequently, Eggleston would unilaterally debit the nominee's account for the interest payment and inform and pay back the nominee afterward. In one instance, Eggleston even debited a nominee-borrower's *wife's* account, when the nominee (Darrell Moritz) didn't have enough funds in his account to cover the interest payment. The fact that Eggleston resorted to such drastic measures illustrates how determined he was to deceive the Bank as to the true nature of the loans.

d. The creditor justifiably relied upon the representation.

Under § 523(a)(2)(a), a plaintiff must prove that its reliance on the debtor's representations was "justifiable." *Field v. Mans*, 516 U.S. 59, 69–77, 116 S.Ct. 437, 443–46, 133 L.Ed.2d 351 (1995). Justifi-

---

**13.** A number of nominee-borrowers testified that when Eggleston made interest payments on their loans, he would do things such as handing them the money and then immediately taking the money back from them and making the payment to the bank himself. The Court is not quite sure why or how these machinations were necessary to the Debtor's scheme, but it does note that they illustrate the Debtor's awareness that the transaction was fraudulent and needed to be legitimized or "laundered" in some way.

able reliance is a less demanding standard than reasonable reliance and requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Mans*, 516 U.S. at 71, 116 S.Ct. at 444. In the instant case, no evidence has been produced to show that there was any reason for the Bank to suspect that Eggleston's (nominee-) loans were anything other than what they *appeared* to be, i.e., regular loans to customers. As soon as the Bank discovered what Eggleston had been doing, he was terminated.

### e. The creditor was damaged.

There is no dispute that KSBC was damaged by the Debtor's conduct. The evidence clearly showed that KSBC paid $174,750.00 in claims to the Bank and that these claims were the result of the Debtor's fraudulent procurement and nonpayment of nominee loans from the Bank.

For the reasons stated above, the Court finds that the $174,750.00 debt owed by the Debtor to KSBC is nondischargeable under § 523(a)(2)(A).

### 2. Counts III, IV, V, and VI—11 U.S.C. § 523(a)(4).

The Plaintiff also invokes 11 U.S.C. § 523(a)(4) in support of its claim of nondischargeability. That statute provides:

> (a) A discharge under ... this title does not discharge an individual debtor from any debt—
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

Unlike section 523(a)(2)(A), section 523(a)(4) encompasses a number of distinct and separate offenses, and, in the case of embezzlement and larceny, offenses that are actually mutually exclusive. The Plaintiff alleges all of the offenses in the statute: Count III alleges defalcation

while acting in a fiduciary capacity, Counts IV and V allege fraud while acting in a fiduciary capacity, and Count VI alleges embezzlement or larceny. For the sake of convenience, we address Counts IV and V first.

### a. Fraud while acting in a fiduciary capacity—Counts IV and V.

The Plaintiff pleads fraud while acting in a fiduciary capacity in both Counts IV and V. Each Count cites ostensibly different factual grounds for the claim asserted therein, but the Court does not find them so substantially different as to require separate analyses; rather, we find them only to be slightly different aspects and descriptions of essentially the same conduct, i.e., the fraudulent procurement of loans from the Clayco State Bank. Because the factual grounds are substantially similar for both Counts, and perhaps more importantly, because the Court has already determined that the Debtor committed actual fraud under the terms of § 523(a)(2)(A), the only question left at this point is whether the fraud was committed while the Debtor was acting in a fiduciary capacity. *See First State Insurance Co. v. Bryant (In re Bryant)*, 147 B.R. 507, 510 (Bankr.W.D.Mo.1992).

 Whether someone is operating in a "fiduciary capacity" within the meaning of § 523(a)(4) is a question of both federal and state law. *See Federal Deposit Insurance Corporation v. Wright (In re Wright)*, 87 B.R. 1011, 1017 (Bankr.D.S.D. 1988). To the extent that "[t]he fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt," it is a matter of federal law. *Id.* State statutes which impose a trust *ex-maleficio*, constructively imposed *because* of the act of wrongdoing, are not within the scope of § 523(a)(4). *See Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251–52 (6th Cir.1982) (applying the predecessor of § 523(a)(4), section 17(a)(4) of the

former Bankruptcy Act). However, state law determines whether a fiduciary relationship existed prior to the wrongdoing. *Wright,* 87 B.R. at 1017.

 Under Missouri law, a director or officer of a bank occupies a fiduciary relationship to the depositors and the shareholders of the bank. *Moore v. State Bank of Hallsville,* 561 S.W.2d 722, 724–25 (Mo.Ct.App.1978) (citing *Bent v. Priest,* 86 Mo. 475, 483 (Mo.1885)). *See also, Wright,* 87 B.R. at 1017–18 (finding that officer of bank who made nominee-loans had committed fraud while acting in a fiduciary capacity under § 523(a)(4)). The Debtor was an officer of Clayco State Bank and he used this position to perpetrate a fraud; therefore, under the terms of § 523(a)(4) as defined by federal and state law, he committed fraud while acting in a fiduciary capacity.

For the reasons stated above, the Court finds that the $174,750.00 debt owed by the Debtor to KSBC is nondischargeable under § 523(a)(4) on the theory that the Debtor committed fraud while acting in a fiduciary capacity.

b. Defalcation while acting in a fiduciary capacity—Count III.

Having already determined that the Defendant was acting in a fiduciary capacity when he defrauded the bank, our only inquiry here then is to determine whether the Defendant committed defalcation.

 In the Eighth Circuit, defalcation is defined as "the misappropriation of trust funds or money held in any fiduciary capacity [or the] failure to properly account for such funds." *Tudor Oaks Limited Partnership v. Cochrane (In re Cochrane),* 124 F.3d 978, 983 (8th Cir.1997) (quoting *Lewis v. Scott (In re Lewis),* 97 F.3d 1182, 1186 (9th Cir.1996)). "[D]efalcation includes the innocent default of a

fiduciary who fails to account fully for money received ... [and] ... an individual may be liable for defalcation without having the intent to defraud." *Id.* Defalcation is generally considered to be a much broader term than fraud or embezzlement, and does not require intentional conduct. *See Wright,* 87 B.R. at 1017.

 Because defalcation encompasses a range of conduct broader than fraud and embezzlement, and the Court finds that the Defendant has committed both fraud while acting in a fiduciary capacity (see above) and embezzlement (see below), by definition, the requirements for defalcation have been met.[14] Additionally, a number of cases have found defalcation under similar circumstances. *See, e.g., Ohio Casualty Insurance Company v. Fagan (In re Fagan),* 128 B.R. 297 (Bankr.N.D.Okla. 1991); *Wright, supra.*

In *Wright,* the bankruptcy court found that the debtor defendant had committed defalcation while acting in a fiduciary capacity where the debtor, an officer and director of a bank, used his position to make nominee-loans that benefitted (i.e. the loan proceeds were directed to) a corporation of which the debtor was a shareholder and the chairman of the board. The court held:

Wright failed to make proper use of money entrusted to him in the manner required by law, so as to protect the depositors and shareholders of the Bank. The loan of money and the failure to inform the debtors that they would be responsible for repayment demonstrated that Wright disregarded the best interests of the Bank. He failed to ensure repayment of the Bank's investment in Oakland Forging by misleading the individuals who signed the notes. The appropriation of funds in this manner is

14. Under the broad standard of defalcation, even if Eggleston was making real loans as opposed to nominee-loans, his apparent failure to adequately evaluate the financial circumstances of each borrower, for each loan,

before granting the loans might also constitute defalcation. Furthermore, depending on the lending standards used by the bank, it is unlikely that many of the borrowers would have qualified for such large *unsecured* loans.

definitely a use not contemplated by the underlying trust. It is a default in the duty or confidence imposed by the fiduciary relationship and clearly is a defalcation as contemplated by 11 U.S.C. § 523(a)(4).

*Wright*, 87 B.R. at 1019.

Just as in *Wright*, the Debtor here disregarded the best interests of the Bank, put the funds entrusted to him to a use not contemplated by the underlying trust, and defaulted in the duties imposed by the fiduciary relationship. Eggleston assured each one of the nominee-borrowers that he would pay off the loans before they came due, but, in fact, never made a single principal payment on any of the loans. He made some interest payments, but these payments were not for the benefit of the bank as much as they were necessary to prevent his scheme from being discovered. Accordingly, this Court finds that the Debtor committed defalcation as contemplated by 11 U.S.C. § 523(a)(4).

### c. Embezzlement or larceny—Count VI.

 In Count VI of its Complaint, the Plaintiff proceeds under 11 U.S.C. § 523(a)(4) on the theory that its claim against the debtor is nondischargeable because it arose as a consequence of the debtor's embezzlement or larceny of funds from his employer, the Bank.[15] For reasons we discuss forthwith, these offenses are mutually exclusive, so the Defendant cannot be found to have committed both.

However, the Court does find that the Defendant has committed one of these offenses, that is, embezzlement.

 For purposes of § 523(a)(4), both embezzlement and larceny are defined by reference to federal common law. *Allstate Life Insurance Co. of New York v. Guerrerio (In re Guerrerio)*, 143 B.R. 605, 610 (Bankr.S.D.N.Y.1992); *Great American Insurance Co. v. Storms (In re Storms)*, 28 B.R. 761, 764–65 (Bankr. E.D.N.C.1983). Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Belfry v. Cardozo (In re Belfry)*, 862 F.2d 661, 662 (8th Cir.1988) (quoting *In re Schultz*, 46 B.R. 880, 889 (Bankr.D.Nev.1985)). Larceny is the wrongful taking and carrying away of the property of another with the intent to convert such property to the taker's use without the consent of the owner. *Rech v. Burgess (In re Burgess)*, 106 B.R. 612, 622 (Bankr.D.Neb.1989). "The essential difference between larceny and embezzlement is the manner in which property comes into the possession of the person charged. Embezzlement involves a lawful or authorized possession. In the case of larceny, however, the original taking and possession is unlawful." *Id.* Bank officers are considered to have "possession" of a bank's money sufficient to meet the requirements of the offense of embezzlement.[16] Therefore, Eggleston, having law-

---

**15.** For purposes of proving embezzlement or larceny under § 523(a)(4), it is not necessary to show that the defendant committed such offenses while acting in a fiduciary capacity. 4 COLLIER ON BANKRUPTCY ¶ 523.10[1][c] p 523–72 (15th ed. rev.1999).

**16.** The proposition that a bank officer may commit embezzlement even though the funds are not in his or her exclusive, physical possession has long been the law. We quote, as the language cannot be improved upon:

It is not, however, necessary that he should have been in the exclusive custody or possession at the time of the conversion to his own use, in order to constitute this offense.

If the evidence establishes that the business and assets of the bank were actually or practically intrusted to the care and management of the defendant, so that, by virtue of his position as vice president, director, or agent, he had not merely access to, or a constructive holding of, but such actual custody of the funds, moneys, and credits of the association as enabled him to have and exercise control over the same, that would place him in the lawful possession of said funds or other property; and if, while so lawfully in possession of such assets, funds, and credits, or other property, committed to his care and custody for the benefit of the bank, he wrongfully converts any part or

ful possession of the bank's money, could only have committed embezzlement, if it is determined that the Debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used. *In re Belfry*, 862 F.2d at 662. This determination is easily made.

■■■ As an officer of the Bank, the Debtor was not lawfully entitled to use the funds entrusted to him for the purposes which they were in fact used, i.e., loans to himself without Board approval. As mentioned earlier, loans to bank insiders (officers and directors) are controlled by federal statute and banking regulations. The Debtor did not follow these statutes and regulations when he made the disguised loans to himself (and, in all likelihood, did not even follow the Bank's internal regulations for loans to the general public). Therefore, the Court finds that the Debtor committed embezzlement under terms of § 523(a)(4).

### 3. Count VII— § 523(a)(6)

■■■ The final count of the Plaintiff's Complaint, Count VII, claims that Eggleston's debt to the Bank should be nondischargeable pursuant to 11 U.S.C. § 523(a)(6). Section 523(a)(6) provides that a debtor is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).[17] For purposes of this section, the term willful means deliberate or inten-

tional, *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 975, 140 L.Ed.2d 90 (1998), and the term malicious means "targeted at the creditor ... at least in the sense that the conduct is certain or almost certain to cause ... harm." *In re Long*, 774 F.2d 875, 881 (8th Cir.1985).

■■■ In this case, the Court finds that the Debtor's conduct was willful and malicious as defined for the purposes of § 523(a)(6); the deliberate nature of the Debtor's actions is unquestionable, and the certainty of the harm is almost as apparent.

The Debtor's conduct, considered in its entirety, points inescapably to the conclusion that he never intended to repay any of the loans obtained from Clayco State Bank, and was thereby certain to cause harm to it. Over the course of six (6) years, the Debtor used his nominee-loan scheme to "borrow" over $200,000.00 from the Bank, but never made a single payment towards the loan principal. At the time the Debtor joined Clayco State Bank, he had already obtained over $46,000.00 from Commercial Bank, via nominee-loans, but instead of repaying those loans with his own money, he arranged for new loans from Clayco to keep the scheme moving forward. And as the scheme played on, and he borrowed more and more money, his ability to repay the loans decreased, and the likelihood of financial harm to the Bank increased.

portion of said assets to his own use, with intent to injure or defraud the association, he would thereby commit the offense of embezzlement. If his position and employment gave the defendant a superior or a joint and concurrent possession with subordinate employes (sic) or agents of the bank, that would be sufficient to place him in such lawful possession as would enable him to commit the crime of embezzlement, in relation to assets of the bank so committed to his keeping. If, for example, his position and employment in the bank gave the defendant a joint or concurrent possession and custody of the bank's moneys, funds, and credits with the teller, cashier, or other officer, this would constitute lawful posses-

sion on his part for the benefit of the association, equal with that of such teller, cashier, or agent; and if, while so lawfully in possession, either alone or jointly with other officers or agents of the bank, he wrongfully converts said funds or assets to his own use, with intent to injure or defraud the association, he would thereby commit the offense of embezzlement.
*United States v. Breese*, 131 F. 915, 920–21 (W.D.N.C.1904) (quoting *United States v. Harper*, 33 F. 471, 474–76 (1887) (concurring)).

17. Again, the plaintiff must prove this by a preponderance of the evidence. *Grogan, supra.*

The Debtor's contention that because the Bank loans were not due until the Debtor repaid his loan to the individuals is completely without merit. Factually, it's incorrect, and it's irrelevant considering that he never made any principal payments to the individuals. The eventual result would be the same as if the loans were due before he repaid the individuals—the Bank would end up with $200,000.00 in loans that were never going to be repaid.

For the reasons stated herein, it is

**ORDERED** that the Debtor, Larry R. Eggleston, be and is hereby denied discharge pursuant to 11 U.S.C. § 523(a)(2)(A) on all of the nominee loans enumerated in Plaintiff's First Amended Complaint, Counts I and II, and judgment is hereby entered in favor of Plaintiff, Kansas Bankers Surety Company, in the sum of $174,750.00. It is

**FURTHER ORDERED** that the Debtor, Larry R. Eggleston, be and is hereby denied discharge pursuant to 11 U.S.C. § 523(a)(4) on all of the nominee loans enumerated in Plaintiff's First Amended Complaint, Counts III, IV, and V, and judgment is hereby entered in favor of Plaintiff, Kansas Bankers Surety Company, in the sum of $174,750.00. It is

**FURTHER ORDERED** that the Debtor, Larry R. Eggleston, be and is hereby denied discharge pursuant to 11 U.S.C. § 523(a)(4), on the basis of embezzlement but not on the basis of larceny, on all of the nominee loans enumerated in Plaintiff's First Amended Complaint, Count VI, and judgment is hereby entered in favor of Plaintiff, Kansas Bankers Surety Company, in the sum of $174,750.00. It is

**FURTHER ORDERED** that the Debtor, Larry R. Eggleston, be and is hereby denied discharge pursuant to 11 U.S.C. § 523(a)(6) on all of the nominee loans enumerated in Plaintiff's First Amended Complaint, Count VII, and judgment is hereby entered in favor of Plaintiff, Kan-

sas Bankers Surety Company, in the sum of $174,750.00. It is

**FURTHER ORDERED** that the costs of this proceeding be and are hereby taxed to the Debtor Defendant, Larry R. Eggleston, and the Plaintiff is directed to submit its statement of costs as provided by the Rules. It is

**FURTHER ORDERED** that, despite the repetition of the monetary judgment amount in each Count hereinabove, the Plaintiff is entitled to only one recovery of $174,750.00, plus costs.

**SO ORDERED.**